*Notice:  This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DIANA P., | ) | |
| | ) | Supreme Court No. S-15688 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 4FA-12-00096/ |
| v. | ) | 97/98/99 CN |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 7045 – September 1, 2015 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Bethany S. Harbison, Judge.

Appearances:  J. Adam Bartlett, Anchorage, for Appellant. Miranda L. Strong, Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.

## I.    INTRODUCTION

A mother appeals the termination of her parental rights to her four daughters, all Indian children under the Indian Child Welfare Act (ICWA).[1] She argues that the trial court erred in finding that the Office of Children's Services (OCS) proved beyond a reasonable doubt that placing her children in her custody would likely put the children at risk of serious harm.  We affirm the trial court's decision.

## II.    FACTS AND PROCEEDINGS

This case involves Diana and her daughters:  Natalie was born in 2008; Selah was born in 2009; Ava was born in 2010; and Drew was born in 2011.[2]  The children's father has relinquished his parental rights. OCS has been involved with this family since 2009 because of the parents' behavior when they drink.  The children were adjudicated children in need of aid in March 2013.  Following a trial in the summer of 2014, the trial court terminated Diana's parental rights to the children after finding them subject to conduct or conditions described in AS 47.10.011(6),[3] (9),[4] and (10).[5]

---

[1]    25 U.S.C. §§ 1901-1963 (2012).  The Native Village of Grayling has intervened on the children's behalf pursuant to 25 U.S.C. § 1903(1).

[2]    Pseudonyms have been used to protect the privacy of the parties.

[3]    Alaska Statute 47.10.011(6) allows a trial court to find a child to be in need of aid if "the child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent, guardian, or custodian or by the failure of the parent, guardian, or custodian to supervise the child adequately."

[4]    Alaska Statute 47.10.011(9) allows a trial court to find a child to be in need of aid if conduct or conditions created by the parent have subjected the child to neglect.

[5]    Alaska Statute 47.10.011(10) allows a trial court to find a child to be in need of aid if the parent's ability to parent has been substantially impaired by the
(continued...)

Diana appeals.

### A. The Evidence

Diana has struggled with mental illness and substance abuse since she was a teenager. When she was eight or nine years old and living with her father, he committed suicide. She went to live with her mother, who was an alcoholic. Diana has been diagnosed with and treated for bipolar disorder, and she has also been treated for substance abuse at least ten times. Diana has shown a pattern of drinking alcohol while pregnant, abstaining once she learns she is pregnant, and then resuming drinking after the child is born. She admitted at trial that she drank during three of her previous pregnancies. Ava was born with cocaine in her system, but Diana said she did not know how it got there. She speculated that someone put something in her drink one night.

At the time of trial Diana lived with and was financially supported by her boyfriend. She was 23 weeks pregnant with her fifth child and abstaining from intoxicating substances. Diana was focused on healthy activities, such as fishing, hunting, hide tanning, beading, and learning Athabascan. She testified that she had become a totally different person over the past eight or nine months; she was much happier, more patient, and no longer "closed off," and did not "think [in] black and white." Diana testified that her boyfriend did not have a drinking problem, although he was found to be driving under the influence in 2013 and drank with her in December 2013 when she relapsed.

Diana presented testimony from friends who described her past several months of abstinence and the changes she had made since she moved to a new village five months before trial. The witnesses stated that Diana had shown tremendous growth,

---

[5](...continued)
addictive or habitual use of an intoxicant, which has resulted in a substantial risk of harm to the child.

was leading a productive, sober life, and was trusted with people's children. One of Diana's witnesses testified that she did not believe Diana had a drinking problem, but that witness was Diana's third-party custodian following her June 2013 driving under the influence arrest.

The children's paternal great-aunt, Nancy O., appears to be the children's final placement. Nancy has had tribal custody of the children on and off for several years. She has observed the parents' repeated pattern of abstinence from substance abuse, followed by relapse. According to Nancy, "there [were] no two better people on this earth who could take care of those kids" when they were sober. But when they were drinking, they were not good parents. Diana became confrontational and bossy, the children went hungry, and their home was unstable. Natalie became the caregiver of her siblings; when she was four years old she made her younger sisters' bottles, changed their diapers, and dressed them. This caused Natalie to be a "worry wart," and the stress caused her "tummy issues" and exacerbated her eczema. The other children also have issues: Selah has severe separation anxiety, Ava's speech was delayed, and Drew has "the shakes."

Nancy testified that Diana seemed to be doing better in 2014; she understood how her drinking affected her children, had become reliable, visited the children several times a month, and bonded with and cared for the children. But Nancy feared the impact a future relapse would have on the children and acknowledged that Diana's recent sobriety had lasted only five months out of many years of substance abuse. Nancy said she was willing to care for the children until the day she died and would continue to allow Diana to be in their lives if she remained sober. Nancy testified that the children told her that they would like to stay with her if they cannot live with their mother.

OCS social worker Rosalie Rein testified about the past harm the children suffered under the care of their parents. Before OCS took custody of the children, their medical needs were not being met and they were exposed to danger. On one occasion Diana left Selah with her maternal grandmother, who pulled a knife on her partner in front of Selah. On another occasion Diana and her mother wanted to go out drinking, but because the person they found to watch the children was unwilling, "they left the kids there and ran away." OCS and the Village of Grayling tried to reunify the family over a period of several years. But the multiple placements beginning at a very young age caused the children to lack any sense of permanency and to fear OCS would take them away. Rein corroborated Nancy's testimony that Selah suffered separation anxiety.

OCS offered the reports and testimony from two experts: Christy Pichette of Pichette Counseling Services and Lisa Farrell from Hope Counseling Center. Without objection, Pichette and Farrell testified as experts in the diagnosis and treatment of substance abuse and substance-abuse-related disorders.

Pichette's written report was based on two evaluations of Diana, one in 2012 and a second one in 2013. Pichette diagnosed Diana with alcohol dependence and other substance dependence in full sustained remission. She noted that Diana self-reported being diagnosed with bipolar disorder when she was a child, and that there was also evidence within the assessment suggesting post-traumatic stress disorder. Pichette's report included collateral information provided by OCS detailing the parents' alcohol abuse and how it caused the children to be neglected and in danger of physical abuse: people drank in excess and used drugs in the home; there was no food in the refrigerator; the children were dirty and had rashes on their bottoms due to lack of cleanliness; and at least one of the children had been exposed to domestic violence. The collateral information in the report described several other occasions of neglect due to substance abuse and concluded that the children were extremely vulnerable due to their young ages,

inability to self-protect, and their prenatal exposure to alcohol and/or drugs. Pichette recommended a "Level III.3 Medium Intensity Treatment Program (preferably no less than six months and also dual diagnosis) followed by a long-term Aftercare Program" for Diana.

Pichette testified that Diana seemed very open, honest, and willing to engage in treatment. But Pichette recognized that someone who has had "too much treatment" may become "therapized," which makes it difficult to get an accurate assessment. In Pichette's opinion, a person cannot solve a substance abuse problem by moving to another town; the problem continues to exist unless the substance abuser takes the necessary relapse-prevention steps, finds support groups, and addresses the mental health component through therapy.

Lisa Farrell's written report, based on her early 2014 assessment of Diana, described Diana's substance abuse history, OCS's involvement in her childhood, her children's experience of being in OCS and tribal custody, and her current lifestyle. The report also described Diana's pattern of sobriety during pregnancy followed by relapse after each child's birth. Farrell's report did not address the children's welfare, other than to include essentially the same collateral information OCS had given to Pichette, describing Diana's history of passive-aggressive behavior, yelling, irritation, and stress caused by having multiple children. Farrell recommended "a Long Term (6 months to 2 years) Residential Clinically Managed High Intensity Treatment program for women with Children." Farrell also firmly recommended that Diana "immerse herself in a strong parenting program, a substance abuse program, and [dialectical behavioral therapy] skills development program," and engage in parent and child interaction therapy.

At trial Farrell explained that she based her recommendation on Diana's inability to refrain from substance abuse, her emotional struggles, and the skills she needed to learn to provide a safe environment for her children. Farrell noted that people

who abstain from drinking without processing unresolved childhood trauma have a higher risk of relapse than individuals who have processed their negative childhood experiences. She felt that Diana lacked insight about her drinking; Diana told Farrell she would not have time to drink if her children were in her care, but in fact her children had been removed from her custody due to drinking. Farrell was concerned that the children needed supervision and protection around Diana because she had a history of passive-aggressive behavior, yelling, and a generally irritable temperament when she was stressed. She advised that if the children were to be reunited with Diana they would have to be reintroduced into Diana's care one child at a time, with supervision.

## B.     The Trial Court's Findings

In a thoughtful and detailed decision, the trial court found that OCS had "proved by clear and convincing evidence that there [was] a substantial risk that the children will suffer substantial physical harm as a result of conduct by or conditions created by [Diana]," pursuant to AS 47.10.011(6). The court cited Diana's behavior of leaving the children in unsafe homes or failing to arrange for supervision, and requiring four-year-old Natalie to care for her siblings. The court noted that when Diana drank, her children went hungry and their medical needs were not met. The court also addressed Diana's alcohol abuse pattern during and after pregnancy, and another pattern of attending substance abuse programs without completing them or completing them and then relapsing soon after. The court found: "Because [Diana] has not received needed treatment, she is almost certain to relapse. If she does, there is a substantial risk that the children will suffer substantial physical harm — from lack of food, lack of supervision, or exposure to unsafe care providers." The trial court made the remaining required statutory findings under the child-in-need-of-aid (CINA) Rules and ICWA.

Acknowledging that ICWA requires a finding beyond a reasonable doubt that continued custody by the parent is likely to cause the children serious harm, the trial court

applied our two-pronged approach requiring OCS to prove that (1) the parent's conduct is likely to harm the children, and (2) it is unlikely that the parent will change her conduct.[6] Noting that OCS "typically has an expert testify about the potential harm to the child," the trial court commented that there was "very little case law about the subject matter of an expert's testimony in determining the likelihood that the child will experience harm." The court cited *Marcia V. v. State, Office of Children's Services*[7] as holding that expert testimony is sufficient to meet ICWA's requirements even when the expert is only qualified to provide an opinion on the first prong and allowing OCS to prove the second prong through lay testimony and other evidence. The trial court stated that there are no published Alaska cases on point and instead cited two unpublished cases,[8] where we upheld termination of parental rights even though expert testimony proved only one prong of the test. Based on its analysis of these cases, the trial court concluded that, when the basis for termination is culturally neutral, the substantial-harm requirement may be met by a combination of lay testimony and other evidence that the parent's conduct is harmful to the child, as well as expert testimony that the conduct is likely to continue.

The trial court noted that in the present case, the experts did not focus on the harm alcoholic parents cause their children, but they did testify that if Diana received custody of all of her children it would be harmful to her sobriety. The court observed that the lay testimony established that Diana's drinking was harmful to the children. And the

---

[6]    *See Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1269-70 (Alaska 2014).

[7]    201 P.3d 496, 501-02, 504-05, 508 (Alaska 2009).

[8]    *See Camille H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1419, 2012 WL 1649167 (Alaska May 10, 2012); *Stephen H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1400, 2011 WL 6004352 (Alaska Nov. 30, 2011).

court came to what it called a "common-sense" conclusion that if the children were removed from their bonded placement and placed in the care of a mother who, because of alcohol, is not emotionally or physically stable enough to care for her own needs, the children would be at substantial risk of harm. Because of Diana's unresolved alcoholism and mental health problems, her inability to care for herself, and her history of drinking and neglect, the trial court found beyond a reasonable doubt that placing the children in her custody would likely put them at substantial risk of harm.

## III. STANDARD OF REVIEW

Before terminating parental rights under ICWA and the CINA statutes and rules, the trial court must find by clear and convincing evidence that the child has been subjected to conduct or conditions described in AS 47.10.011;[9] that the parent has not remedied, or has not remedied within a reasonable time, the conduct or conditions in the home that place the child at substantial risk of physical or mental injury;[10] and in the case of an Indian child, that active but unsuccessful efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family.[11] ICWA also requires that the trial court find, "by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[12] Finally, the trial court must

---

[9] AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

[10] AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A)(i)-(ii).

[11] 25 U.S.C. § 1912(d) (2012); CINA Rule 18(c)(2)(B).

[12] 25 U.S.C. § 1912(f); *see also* CINA Rule 18(c)(4).

determine by a preponderance of the evidence that "termination of parental rights is in the best interests of the child."[13]

The only issue Diana raises in her appeal is whether the trial court erred in finding that OCS proved beyond a reasonable doubt that placing her children in her custody likely would put the children at risk of serious emotional or physical harm. "[W]hether substantial evidence supports the court's conclusion that an Indian child is likely to be seriously harmed if returned to his parent is a mixed question of fact and law."[14] The court's factual findings are reviewed under the clearly erroneous standard, and its legal conclusions are reviewed de novo.[15] "Clear error arises only when our review of the entire record leaves us with a definite and firm conviction that the superior court has made a mistake."[16]

## IV.    DISCUSSION

**The Trial Court Did Not Err In Finding That The Evidence Presented Proved Beyond A Reasonable Doubt That The Children Would Likely Be Seriously Harmed If Returned To Diana.**

ICWA requires that the trial court find "by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[17] We

---

[13]     CINA Rule 18(c)(3); *see also* AS 47.10.088(c).

[14]     *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 989 (Alaska 2002) (citing *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 949-50 (Alaska 2000)) (holding that factual findings in termination proceedings are reviewed under the clearly erroneous standard, but whether those findings comport with ICWA requirements presents questions of law).

[15]     *L.G.*, 14 P.3d at 949-50.

[17]     25 U.S.C. § 1912(f); *see also* CINA Rule 18(c)(4).

have adopted a two-prong test to determine whether continued custody by the parent is likely to cause serious harm to the child. Proof that a parent having custody is likely to cause a child serious harm requires evidence that (1) the parent's conduct is likely to harm the child and (2) the parent's conduct is unlikely to change.[18] We have explained that "[s]erious harm can be proved through the testimony of a single expert witness, by aggregating the testimony of expert witnesses, or by aggregating the testimony of expert and lay witnesses."[19] "The findings of a likelihood of serious emotional or physical damage are findings that must be made by the trial judge, not the expert witness."[20] Alcohol relapses may be considered in establishing the likelihood that a child would suffer harm.[21]

While ICWA requires that the evidence supporting this finding include expert testimony, it does not clarify the scope of the expert testimony required,[22] nor does it require that the expert testimony provide the sole basis for the court's conclusion.[23] "[N]o one individual qualified expert witness must possess all the knowledge necessary to support both

---

[18] *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1269-70 (Alaska 2014)*; see also Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 767 (Alaska 2009) ("Proof of the likelihood of future harm must include qualified expert testimony based upon the particular facts and issues of the case, but the trial court may aggregate this with other evidence as a basis for its finding." (quoting *E.A.*, 46 P.3d at 991) (internal quotation marks omitted)).

[19] *Chloe W.*, 336 P.3d at 1270 (quoting *L.G.*, 14 P.3d at 950) (internal quotation marks omitted).

[20] *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 508 (Alaska 2009).

[21] *See L.G.*, 14 P.3d at 950.

[22] *See* 25 U.S.C. § 1912.

[23] *See E.A.*, 46 P.3d at 992.

prongs of the question posed by the statute."[24] We have not yet established whether expert testimony on its own must directly answer both prongs of the test.

Although it may be best practice for expert testimony to address both prongs of the "serious emotional or physical damage to the child" test, we conclude that it is not required when the basis for termination of parental rights is culturally neutral: so long as qualified expert testimony directly supports one prong of the substantial harm requirement and inferentially supports the other prong, the statutory requirements will be satisfied. It therefore was not legal error under ICWA for the trial court to make a common-sense finding based on lay testimony that reuniting Diana with her children would likely result in serious emotional or physical damage to the children.

### 1.     The first prong:  conduct would likely harm the children

Diana argues that the trial court's risk-of-harm finding contravened ICWA because it was based on lay testimony and not expert testimony. She also contends that the trial court should not have considered expert testimony in finding that her conduct would likely harm the children because neither expert was qualified to testify about the children.

We conclude that the trial court had appropriate support for its finding that the first prong of the test was satisfied. The finding that the children would likely suffer harm if returned to Diana is inferentially supported by the experts' opinions that Diana was unable to cope with caring for multiple children and would likely relapse after having her fifth child. It is also directly supported by lay testimony that substance abuse had caused her to abandon and neglect her children in the past.

---

[24]     *In re Parental Rights of T.O.*, 759 P.2d 1308, 1311 (Alaska 1988).

We recently addressed this issue in *Sadie D. v. State, Department of Health & Social Services, Office of Children's Services*.[25] There, one of the experts was qualified as an expert in substance abuse and treatment. The other expert was a mental health clinician and qualified as an expert in psychological assessments. Both experts testified about the mother's mental health and substance abuse issues, although neither spoke directly to the harm the children would likely suffer as a result of the mother's problems.[26] However, a number of lay witnesses testified about the negative impact the mother's problems had on her child's needs.[27] The psychologist's report addressed the mother's apparent inability to care for her child, her "lack of psychiatric stability," the role substance abuse played in her ability to respond to her child, and the risk her housing situation presented to herself and her child.[28] We stated: "In the aggregate, including the testimony of qualified experts, the record supports the superior court's predictive finding that [the child] faced a likelihood of physical or emotional harm if he was returned to his mother's care. The superior court did not clearly err in making that finding."[29]

Our holding in *Camille H. v. State, Department of Health & Social Services, Office of Children's Services*[30] similarly supports the trial court's finding of substantial risk of harm even though the expert testimony did not directly address the harm alcoholic parents cause their children. There, we relied upon the "common-sense notion" that intoxicated

---

[25] Mem. Op. & J. No. 1516, 2014 WL 4536352, at *4 (Alaska Sept. 10, 2014).

[26] *Id.* at *4-5.

[27] *Id.* at *5.

[28] *Id.*

[29] *Id.*

[30] Mem. Op. & J. No. 1419, 2012 WL 1649167, at *10 (Alaska May 10, 2012).

parents put their children at risk, particularly in light of the affected children's special needs and the treatment providers' testimony that the parents' profound alcoholism remained unresolved.[31]

Neither expert in the present case expressly stated that the children would likely be harmed if returned to Diana, nor was either expert specifically qualified to do so. But the experts were qualified to render opinions on the second prong of the test and they did so, as we discuss in the next section. Furthermore, support for the first prong could reasonably be gleaned from the experts' observations that Diana would likely relapse and not be a safe mother.

Furthermore, the lay witnesses' testimony clearly supported the trial court's finding that Diana's conduct would likely seriously harm the children. For example, OCS worker Rein testified that before OCS took custody of the children, their medical needs were not met and they were exposed to danger. For several years OCS and the Village of Grayling tried to reunify the family but were met with continued adversity caused by the parents' alcohol and substance abuse, which diminished the children's sense of permanency. Nancy testified that she was concerned Diana would relapse and cause harm to the children, after seven years of back and forth and multiple placements. Nancy also testified about Diana's difficulty parenting when she drank, her numerous attempts at sobriety, and the impact her behavior had on the children, including stress, anxiety, and developmental delays. We conclude that reasonable inferences from the expert testimony, coupled with lay witness testimony and documentary evidence from the record, are sufficient to support the trial court's finding that returning the children to Diana's care was likely to endanger them. We therefore affirm the trial court's serious harm finding.

---

[31] *Id.* at *10-11.

### 2.    The second prong:  conduct was not likely to change

Diana argues that OCS's expert testimony was insufficient to satisfy the second prong.  We conclude that the evidence amply supports the trial court's finding that Diana's conduct was not likely to change.  Pichette testified that with a dual diagnosis, substance abuse will remain an issue until the underlying mental-health issues triggering the abuse are treated.  Farrell's opinion that Diana lacked insight into her drinking behavior also supports a finding that her behavior will not improve in the near future.[32]

The lay testimony also supports the trial court's finding that Diana will likely relapse.  Nancy stated that Diana had a long history of drinking in excess and had abstained from drinking for only five months.  Diana herself testified that she had struggled with mental illness and alcohol and substance abuse since she was young, had been in treatment at least ten times, and had a pattern of relapsing after each pregnancy.  Because the aggregated testimony of expert and lay witnesses supports the trial court's finding that Diana likely will continue to relapse until she resolves her underlying mental health issues, the trial court's conduct-not-likely-to-change finding is not clearly erroneous.[33]

---

[32]     *See Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 767 (Alaska 2009) ("Although the court must focus on risk of future harm rather than past injury, past failures may predict future conduct.").

[33]     Though Diana did not appeal the trial court's active efforts finding, we take the opportunity to commend the efforts OCS made in attempting, unsuccessfully, to reunite the children with their mother.  OCS and the Native Village of Grayling alternately tried to reunify the family and protect the children during a five-year span. They provided in-home services; substance abuse assessments; and opportunities for treatment, including a urinalysis program and airplane travel.  They also assisted with transitions when the children were removed from their parents' care, maintained contact among the children when they were apart, provided assessments and evaluations for the children, and ensured visitation with the children.

### 3.    Summary

To summarize, expert witnesses testified that Diana lacked insight into her drinking; needed long-term residential treatment; had a history of passive-aggressive behavior, yelling, irritation, and stress caused by multiple children; and was at high risk of relapse. An expert testified that the children needed supervision and protection when around Diana because of these problems. Lay witnesses testified that Diana's drinking was harmful to her children. Considering all of this evidence, we agree with the trial court: if the children were removed from their bonded placement and placed in Diana's care, they would be at substantial risk of harm. The trial court did not err in making this finding beyond a reasonable doubt.

## V.    CONCLUSION

We AFFIRM the trial court's order terminating Diana's parental rights.