NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

AVA T.                                          )
                                                )       Supreme Court No. S-16144
               Appellant,                       )
                                                )       Superior Court No. 3AN-12-00296 CN
       v.                                       )
                                                )       MEMORANDUM OPINION
STATE OF ALASKA,                                )         AND JUDGMENT*
DEPARTMENT OF HEALTH &                          )
SOCIAL SERVICES, OFFICE OF                      )       No. 1596 – September 23, 2016
CHILDREN'S SERVICES,                            )
                                                )
               Appellee.                        )
_____                 )

        Appeal from the Superior Court of the State of Alaska, Third
        Judicial District, Anchorage, Paul E. Olson, Judge.

        Appearances: Rachel Cella, Assistant Public Defender, and
        Quinlan G. Steiner, Public Defender, Anchorage, for
        Appellant. Miranda L. Strong, Assistant Attorney General,
        Anchorage, and Craig W. Richards, Attorney General,
        Juneau, for Appellee.

        Before: Stowers, Chief Justice, Maassen, and Bolger,
        Justices. [Fabe and Winfree, Justices, not participating.]

_____

*       Entered under Alaska Appellate Rule 214.

# I.    INTRODUCTION

Ava T. and her daughter Amelia[1] are Yup'ik Alaska Natives and are enrolled members of the Orutsararmiut Native Council; Amelia is an Indian child for purposes of the Indian Child Welfare Act (ICWA).[2] Finding that Amelia was a child in need of aid under AS 47.10.011(9) (neglect) and AS 47.10.011(10) (substance abuse), the superior court made statutorily required findings and terminated Ava's parental rights to Amelia, who was seven years old at the time of the termination trial.

Ava appeals the termination of her parental rights.[3] She argues that the trial court erred in finding that OCS proved beyond a reasonable doubt that placing the child in her custody likely put Amelia at risk of serious harm. But because the evidence supports the superior court's findings, we affirm the order terminating parental rights.

# II.    FACTS & PROCEEDINGS

The Office of Children's Services (OCS) became involved with Ava during the summer of 2012 after it received reports of neglect and substance abuse, which alleged that Ava and her boyfriend Darius M. were "shooting up drugs" and living in filthy conditions. An Anchorage Police Department (APD) safety check identified numerous hazards in the home including 30 to 40 used needles in the bedroom, floors covered in food and garbage, and various drug-related items strewn throughout the house. Ava and Darius were cited for neglect. Within a few days of the citation, Ava

---

[1]    Pseudonyms have been used to protect the privacy of the parties.

[2]    25 U.S.C. §§ 1901-1963 (2012). The Orutsararmiut Native Council intervened pursuant to 25 U.S.C. § 1911(c).

[3]    Amelia's father has relinquished his parental rights and did not participate in this appeal.

tested positive for marijuana, amphetamines, methamphetamine, and morphine. She maintained, however, that she did not use any drugs.

In September 2012 OCS held a team decision-making meeting to discuss the possibility of an in-home safety plan for Amelia. But because OCS could not establish a long-term placement option with one of Amelia's family members, OCS filed an emergency custody petition and assumed custody of Amelia. At a January 2013 hearing, Ava stipulated to Amelia's adjudication as a child in need of aid because she "ha[d] a substance abuse problem that ha[d] impaired [her] ability to be a parent." Ava did not attend the disposition hearing held in May 2013. After a September 2013 permanency hearing, the court ordered that the disposition goal was adoption. In February 2014 OCS filed a petition to terminate Ava's parental rights.

The court terminated Ava's parental rights to Amelia after a two-day trial in May 2015, finding that Amelia was a child in need of aid under AS 47.10.011(9)[4] (neglect) and AS 47.10.011(10)[5] (substance abuse). Ava appeals.

A.    **Evidence**

    1.    **Ava's background**

Ava had a turbulent childhood: when she was a teenager, her family relocated from Bethel to Anchorage, and her parents, who had a history of domestic violence and alcoholism, divorced shortly thereafter. At age 14 Ava began abusing alcohol and dropped out of middle school. By age 18 she had a daily drinking habit,

---

[4]    AS 47.10.011(9) allows a trial court to find a child to be in need of aid if conduct or conditions created by the parent have subjected the child to neglect.

[5]    AS 47.10.011(10) allows a trial court to find a child to be in need of aid if the parent's "ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant" that "has resulted in a substantial risk of harm to the child."

multiple convictions for consumption as a minor, and had received treatment for acute alcohol intoxication.

Around the age of twenty, Ava was involved in domestic violence disputes. She had her first child, Amelia, at age 22. Both of Ava's parents died while Amelia was still a toddler, and after their deaths, Ava started to use "harder" substances including methamphetamine and opiates. Her relationship with her boyfriend, Darius, was also marred by drug abuse.

## 2. Lay witness evidence

When OCS received the initial report of neglect and harm in August 2012, Ava was living with Darius, and Amelia was four years old. An OCS worker testified that when Ava was confronted about the allegations of drug use and unsanitary conditions reported in the home, she denied them. The day after APD conducted its welfare check, OCS went to Ava's home and observed dangerous conditions that matched those alleged in the report, including "razor blades," "residue of drugs still just out in the open," and "syringes on the floor."

An OCS worker testified that initial assessments of Amelia suggested that she was dirty, but seemingly well-adjusted; a follow-up investigation revealed, however, that Amelia had burns on her hand, extreme tooth decay that required surgical correction, and speech characteristics that reflected developmental delay. Amelia also tested positive for cocaine. During OCS's interview with Amelia, she revealed that a man she identified as "grandpa" had sexually abused her and touched her genitals on multiple occasions.

After OCS took custody of Amelia, reports from her foster family revealed concerns about her mental well-being because she had nightmares and difficulty sleeping, demonstrated attachment issues, and had random outbursts of crying. OCS arranged to have Amelia treated by a therapist, Brittany Beaujean, who diagnosed her

with post-traumatic stress disorder. Amelia also suffered from chronic respiratory ailments.

In October 2012 OCS developed a case plan for Ava, but "her substance abused impair[ed] her ability to maintain regular contact (telephonic) and participate in case[-]planning," as exemplified by her inconsistent contact with OCS and inability to remember times and dates. A November 2014 case plan that was admitted as evidence suggested that it was not until after Amelia had been in OCS custody for more than two years that Ava was ready to admit she had a drug abuse problem and was unable to provide appropriate care for her daughter.

Testimony from several OCS case specialists explained that Ava had a pattern of beginning treatment programs and then leaving the programs or being forced to leave them because she missed appointments. Testimony also indicated that Ava failed to complete urinalysis tests; during trial, Jessica Mulhern, an OCS protective services specialist, recounted an incident where Ava failed to complete the drug test even after Mulhern had walked Ava to a cab and sent her to the testing facility. OCS case workers also testified that Ava missed her first mental health appointment with Dr. Michael Rose, was inconsistent with her visits with Amelia, and failed to participate in parenting classes at Cook Inlet Tribal Council, despite OCS's offers to assist with transportation and scheduling. Further testimony by OCS workers indicated that Ava refused their referrals and offers to assist her with finding safe housing and that soon after she stipulated that Amelia was a child in need of aid she became homeless with her boyfriend and relapsed.

In the winter of 2013 Ava moved to a dry village in rural Alaska. Testimony and evidence admitted at trial indicated that she made some progress in her case plan there: after receiving a recommendation that she participate in intensive

outpatient treatment, Ava requested more intensive inpatient treatment.[6]  She then completed a six-week residential treatment program in Bethel and the corresponding follow-up care.

Testimony from Ava's employer and sister-in-law also supported her positive trajectory.  Ava's manager testified that Ava began working at a village store in September 2014 assisting with customer service, running the cash machine, receiving and stocking merchandise, and cleaning.  The manager testified that while she knew Ava only in the context of work, she considered her a dependable employee with no presentation of substance abuse or intoxication.  Ava's sister-in-law noted that Ava had become "like a different person" after moving to the village; she testified that Ava "talk[ed] about [Amelia] all the time" and had been saving money from her wages to send to Amelia.

At the same time, an OCS worker testified that Ava's choice to live with her brother, a registered sex offender, was disconcerting because it prohibited OCS from reunifying Amelia with Ava.  In addition, a worker testified that contact with a village safety officer indicated that there had been reports of intoxication in that home.

An OCS worker testified that despite OCS's concerns with Ava's choice of residence, it continued to arrange visitation with Amelia in Anchorage every three months.  During these visits, OCS also scheduled drug and alcohol tests for Ava and scheduled a make-up psychological evaluation with Dr. Rose.  But Ava again missed her first scheduled day of evaluation with Dr. Rose, and when she arrived for the second day

---

[6]    Testimony is inconsistent as to whether the recommendation for intensive outpatient treatment and Ava's request for intensive inpatient treatment happened before or after her move to the village.  Ava testified that they occurred just after the move, while an OCS case worker testified that they occurred just before the move.  The trial judge did not make a finding on this sequence of events.

of evaluation, Dr. Rose thought he detected the smell of alcohol on her breath. When OCS rescheduled appointments for her drug and alcohol tests during her layover in Bethel on her flight back home, Ava did not complete them. In December 2014 Ava's hair-follicle test result was positive for codeine, hydrocodone, and oxycodone. Testimony from both OCS workers and the guardian *ad litem* evidenced concern with Ava's apparent relapse during the Anchorage visitation trip.

In late 2014 or early 2015, Ava moved to a different residence with her boyfriend and his elderly uncle, both of whom she identified as sober. But OCS did not find out about her new residence until March 2015 and was unable to conduct a home study in time for the termination trial. Also in March, Ava passed a hair-follicle test.

Amelia's foster mother testified that since Amelia's initial placement, Amelia had made significant improvements in her medical health, emotional stability, and academic and cognitive development. Amelia had reached grade-level assessments and graduated from special education, had improved her respiratory issues and relied less on her inhaler, and had become so strongly bonded with her foster family that she became upset when faced with the prospect of leaving her foster family to live with Ava.

### 3. Expert testimony

At trial, the court heard evidence from two qualified expert witnesses, licensed clinical social worker Beaujean and psychologist Dr. Rose. Neither of the experts' qualifications was challenged.

Dr. Rose testified based on his two 2014 appointments with Ava and on his assessment report, which included "collateral materials" he received from OCS. He diagnosed Ava with "neglect of child perpetrator, polysubstance dependence, and probable personality disorder with antisocial and passive-aggressive features." He recommended that Ava participate in psychotherapy, abstain from addictive substances, "establish herself independently," "maintain gainful employment and show that she can

have suitable housing," and attend parenting classes. If Ava did not respond to treatment, he recommended that she consider arranging a legal guardianship for Amelia. He also testified that without parenting classes, Amelia would be "at risk for suffering . . . physical, mental, emotional, or otherwise social neglect from [Ava]."

Beaujean testified that after completing a mental health assessment with Amelia, she diagnosed her with post-traumatic stress disorder. Beaujean explained that she decided to discharge Amelia from therapy once Amelia was no longer demonstrating the separation anxiety and nightmare symptoms for which she was referred. And when asked whether "she c[ould] speak at all to whether there's any risk to children being returned to a parent and any regression in the[ir] progress," Beaujean indicated that such risk was "potential[]" and to be determined on "a case-by-base basis." But she agreed that factors including a parent's "consistency of contact" and a parent's ability to respond to a child's needs were important to support "a safe kind of responsive caregiver." She also noted that "continuing or ongoing substance abuse issue[s] would continue to pose a risk . . . to a child's continued development and welfare if in that parent's care."

**B. The Superior Court's Findings And Conclusions**

The superior court made its initial findings of fact and conclusions of law in an hour-long decision on the record; it memorialized these findings and conclusions in a written termination order dated November 13, 2015. The court found that there was "clear and convincing evidence that the child ha[d] been subjected to conduct or conditions described in AS 47.10.011 subsections (9) and (10)." Citing to statutory provisions regarding neglect and substance abuse,[7] the court found that Amelia was a child in need of aid because "conduct by or conditions created by [Ava] . . . ha[d] subjected [Amelia] . . . to neglect," and because Ava's "ability to parent ha[d] been

---

[7]     *See* AS 47.10.088(a)(1); AS 47.10.011(9)-(10).

substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant had resulted in a substantial risk of harm to the child." The court also made the required statutory finding that a preponderance of the evidence supported the conclusion that termination of Ava's parental rights was in Amelia's best interests.

Specific to termination of parental rights to an Indian child, the superior court found "proof beyond a reasonable doubt, including testimony of qualified expert witnesses, that the return of the child to the mother's custody is likely to result in serious emotional or physical damage to the child." And it made findings relevant to each prong of our substantial-harm test,[8] concluding that Ava's "long history of substance abuse" caused "significant psychological and emotional harm" to Amelia:

> The long period of time that the mother abused substances and her minimization of her substance abuse problem leads this Court to conclude that there is a strong likelihood that the harmful conduct will continue to exist. It is clearly too soon to determine whether the mother's involvement with substances is over. Her track record of sobriety is simply too short.

The court concluded that Ava's conduct would likely cause serious harm to Amelia and that it was unlikely that Ava would change her conduct.

Ava appeals.

---

[8]     We have required trial courts to apply a two-pronged test when assessing the required finding of harm; this test requires evidence that (1) the parent's conduct is likely to seriously harm the child, and (2) the parent's conduct is unlikely to change. *Diana P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 355 P.3d 541, 546 (Alaska 2015).

## III. STANDARD OF REVIEW

ICWA and the CINA statutes and rules require that in order for a trial court to terminate parental rights to an Indian child, the court must "find by clear and convincing evidence that the child has been subjected to conduct or conditions described in AS 47.10.011."[9] In addition, the court must find by clear and convincing evidence that the parent has not remedied, or failed to remedy "within a reasonable time, the conduct or conditions in the home that place[d] the child at substantial risk of physical or mental injury,"[10] and "that [OCS] has made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts were unsuccessful."[11] Under ICWA, the trial court must find "by evidence beyond a reasonable doubt . . . that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[12] "The findings of a likelihood of serious emotional or physical damage are findings that must be made by the trial judge, not [an] expert witness."[13] The trial court is also required to determine

---

[9] *Id.* at 546 (citing AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A)).

[10] *Id.* (citing AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A).

[11] *Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 350 (Alaska 2016) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 527 (Alaska 2013)); *see also* 25 U.S.C. § 1912(d) (2012); CINA Rule 18(c)(2)(B).

[12] 25 U.S.C. § 1912(f).

[13] *Diana P.*, 355 P.3d at 546-47 (quoting *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 508 (Alaska 2009)).

"by a preponderance of the evidence that termination of parental rights is in the best interests of the child."[14]

We review a trial court's factual findings for clear error and its legal conclusions using our independent judgment;[15] we review de novo the trial court's application of law to factual findings, including "whether the expert testimony requirement of [ICWA] is satisfied."[16] Clear error will be found only "if, after reviewing the entire record in the light most favorable to the party prevailing below, we are left with a definite and firm conviction a mistake has been made."[17]

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err In Finding Beyond A Reasonable Doubt That Amelia Would Likely Be Seriously Harmed If Returned To Ava's Care.

The superior court made all of the statutory findings required under ICWA and the CINA rules; at issue in this appeal is whether the court clearly erred in finding that OCS proved beyond a reasonable doubt that returning Amelia to Ava's custody would place Amelia at risk of serious emotional or physical harm. While the court had evidence that Ava made positive changes just before the termination trial, the court made

---

[14]    *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1263 (Alaska 2010) (quoting CINA Rule 18(c)(3)).

[15]    *Id.* (citing 25 U.S.C. § 1912(f)); *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009); *see also* CINA Rule 18(c)(4).

[16]    *Ben M.*, 204 P.3d at 1018.

[17]    *Timothy G. v. State, Dep't of Health and Soc. Servs., Office of Children's Servs.*, 372 P.3d 235, 238 (Alaska 2016) (citing *Christianson v. Conrad-Houston Ins.*, 318 P.3d 390, 396 (Alaska 2014)).

a "common-sense" determination[18] that her five months of possible sobriety was insufficient to overcome testimony about Ava's past substance abuse and substance-abuse disorder and that returning Amelia to her care would likely cause significant harm to Amelia.  Based on our review of the record in light of our two-pronged substantial-harm test,[19] we perceive no clear error in the superior court's finding that Ava's conduct would likely cause serious harm to Amelia if returned to her custody.  We also conclude that the court did not clearly err in finding that Ava was unlikely to change her conduct of neglecting Amelia and engaging in substance abuse.

1.    **The superior court did not err in finding that Ava's conduct was likely to harm the child.**

Ava argues that the superior court did not have evidence sufficient to establish beyond a reasonable doubt that her conduct would likely harm Amelia if she were returned to her care.  She asserts that by the time of the termination trial, she had made significant progress towards remedying the two issues identified by the court — her neglect of Amelia and abuse of controlled substances — that caused Amelia to be a child in need of aid.  OCS responds that the superior court had "[a]mple evidence" to support its required findings under ICWA and the CINA rules, and that the court appropriately applied our substantial-harm test to find that returning Amelia to Ava's custody would cause Amelia serious harm and that Ava would not remedy her conduct.

ICWA requires that before terminating parental rights to an Indian child, the trial court must find "by evidence beyond a reasonable doubt . . . that the continued

---

[18]    *See Diana P.*, 355 P.3d at 545-46 (affirming the superior court's " 'common-sense' conclusion that if the children were removed from their bonded placement and placed in the care of a mother who, because of alcohol, is not emotionally or physically stable enough to care for her own needs, the children would be at substantial risk of harm").

[19]    *Id.* at 546.

custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[20] We have required trial courts to apply a two-pronged test when assessing the required finding of harm; this test requires evidence that (1) the parent's conduct is likely to seriously harm the child, and (2) the parent's conduct is unlikely to change.[21] The "serious harm" requirement "can be proved through the testimony of a single expert witness, by aggregating the testimony of expert witnesses, or by aggregating the testimony of expert and lay witnesses,"[22] but "[t]he findings of a likelihood of serious emotional or physical damage . . . must be made by the trial judge."[23]

In *Diana P. v. State, Department of Health & Social Services, Office of Children's Services*, a case with facts very similar to those in this case, we concluded that "reasonable inferences from the expert testimony, coupled with lay witness testimony and documentary evidence from the record [was] sufficient to support the trial court's finding" under the first prong of the substantial-harm test.[24] Here, the record reveals that a significant amount of evidence was presented by both expert and lay witnesses at trial to support the superior court's finding that Ava's conduct would likely harm Amelia. Expert witness Beaujean testified that ongoing substance abuse by a parent would jeopardize the continued development and welfare of a child if left in the care of that

---

[20]     *Id*. (second alteration in original) (quoting 25 U.S.C. § 1912(f)).

[21]     *Id.*

[22]     *Id.* (quoting *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1270 (Alaska 2014)).

[23]     *Id.* at 546-47 (quoting *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 508 (Alaska 2009)).

[24]     *Id*. at 548.

parent. Expert psychologist Dr. Rose outlined a list of actions that Ava needed to take to address her continuing problems with substance abuse: these included participating in psychotherapy, abstaining from substances, maintaining gainful employment and housing, and participating in parenting classes, which he felt were "necessary" in order for Ava to avoid placing Amelia at risk of physical, mental, emotional, or social neglect. Ava did not make efforts to achieve these goals until very late in the case.

In addition OCS case workers testified to a long history of Ava cycling through treatment programs, and both an OCS case worker and a guardian *ad litem* testified to their concerns regarding Ava's relapse after she tested positive for opiates in December 2014. Ava testified that she had started abusing substances at a young age and engaged with mental health services "off and on" after OCS became involved. Contrary to the evidence at trial, Ava denied relapsing during her last visitation in Anchorage. And Amelia's foster mother testified that Amelia had made across-the-board progress, that Amelia became upset when someone mentioned returning to her mother's care, and that Amelia was well-bonded with the family who wished to adopt her. We conclude that the superior court did not clearly err in finding that Ava's conduct would likely seriously harm Amelia if she regained custody.

### 2. The superior court did not err in finding that Ava's conduct was unlikely to change.

The bulk of Ava's briefing argues that the superior court erred in finding that evidence proved beyond a reasonable doubt that Amelia would suffer serious harm if returned to Ava's care because Ava's conduct was not likely to change. Ava argues that the court erred in its finding that Ava's conduct was unlikely to change given her recent progress in addressing her drug abuse and employment issues; she urges us to reverse the court's substantial-harm finding because there was little evidence to contradict that Ava would continue to remedy her conduct.

We are not persuaded the superior court clearly erred in its findings. Contrary to Ava's assertion that there was a "paucity of evidence" supporting the court's determination of the likelihood of future harm, the court heard a significant amount of testimony from both lay and expert witnesses establishing that returning Amelia to Ava would cause her serious harm and that Ava's historic cycles of treatment and relapse indicate that she would likely be unable to maintain her recent progress. The court acknowledged in both its oral decision and written order Ava's progress in finding a job, reportedly moving into stable housing, completing her first treatment program, and testing negative for substances. But when it "consider[ed] the length of and extent of the substance use," the court found that Ava's documented period of sobriety was "very short."

As Ava points out, in *J.J. v. State, Department of Health & Social Services, Division of Family & Youth Services*, we weighed a "substantial period of sobriety" against "[p]ast addictive behavior and associated parenting failures" when considering predictors of future conduct.[25] But in *J.J.*, the "substantial period" was almost a year;[26] Ava tested positive for drugs five months before trial. Given the substantial amount of evidence the court had before it regarding Ava's long-term, historic behavioral patterns and past substance abuse, we conclude that the superior court did not clearly err in finding that, under the second prong of the substantial-harm analysis, Ava's conduct was not likely to change.

### 3.    Additional issues

Ava also asserts that the superior court improperly relied on evidence of her mental health issues in making its substantial-harm findings. She is mistaken. While

---

[25]    38 P.3d 7, 11 (Alaska 2001).

[26]    *Id*. at 10.

OCS included Ava's mental health assessments and treatment plans in its case plans, OCS did not allege — nor did the superior court find — that Amelia was a child in need of aid due to mental health concerns. A trial court's consideration of a parent's mental health status can be integral to its substantial-harm findings, and we find no error with the superior court's consideration of mental health evidence in relation to the issue of substantial harm.

Finally, Ava requests that we apply the 2015 Bureau of Indian Affairs's Guidelines for State Courts and Agencies in Indian Child Custody Proceedings and the proposed regulations implementing them.[27] She specifically requests that we consider the updated guidelines regarding application of ICWA's harm provisions.[28] However, as Ava herself acknowledges, we recently declined to apply the regulations, in part, because they are not yet effective.[29] The new regulations will become effective on December 12, 2016,[30] and we therefore consider Ava's case under the law in effect at the time of her trial.

## V.    CONCLUSION

We AFFIRM the superior court's order terminating Ava's parental rights to Amelia.

---

[27] Regulations for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 14,880 (Mar. 20, 2015); Guidelines for State Courts and Agencies In Indian Child Custody Proceedings, 80 Fed. Reg. 10,146 (Feb. 25, 2015).

[28] 80 Fed. Reg. at 14,880 § 23.121.

[29] *See Kent K. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-15708, 2016 WL 483254, at *4-7 (Alaska Feb. 3, 2016).

[30] 81 Fed. Reg. 38,778 (June 14, 2016).