NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| LOUISA M., | ) |
| | ) Supreme Court No. S-17592 |
| Appellant, | ) |
| | ) Superior Court Nos. |
| v. | ) 4FA-17-00032/00033 CN |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) MEMORANDUM OPINION |
| OF HEALTH & SOCIAL SERVICES, | ) AND JUDGMENT* |
| OFFICE OF CHILDREN'S SERVICES, | ) |
| | ) No. 1801 – November 12, 2020 |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Thomas I. Temple, Judge.

Appearances: Emily L. Jura, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree and Maassen, Justices. [Stowers and Carney, Justices, not participating.]

## I. INTRODUCTION

A mother appeals the termination of her parental rights to her two daughters, who are Indian children as defined by the Indian Child Welfare Act (ICWA). The Office of Children's Services (OCS) took custody of the children for over a year

---

\* Entered under Alaska Appellate Rule 214.

because of concerns with the mother's substance abuse, then returned the children to the home after the mother completed a treatment program and engaged in services. But shortly after reunification OCS took custody of the children again because of the mother's continued substance abuse. As the mother struggled with her addiction, OCS moved to terminate her parental rights. At the time of the termination trial the mother had entered treatment and was making progress in the program.

The superior court terminated the mother's parental rights after hearing from a number of experts who testified about the mother's serious alcohol addiction and the children's need for stability. The mother challenges the superior court's finding that the children would suffer serious harm if they were returned to her custody and its finding that OCS made active efforts to reunify her family. We conclude that the superior court's factual findings are not clearly erroneous and that they satisfied the statutory requirements for termination. We therefore affirm the superior court's order terminating the mother's parental rights.

## II.    FACTS AND PROCEEDINGS

### A.    OCS's Removal Of The Children In 2014

Louisa M. has two daughters, Lilly and Anna,[1] who are Indian children as defined by ICWA.[2] OCS first became involved with the family in June 2014 and worked with Louisa to provide family services. Louisa entered an inpatient alcohol abuse

---

[1]    We use pseudonyms throughout this opinion to protect the family's privacy. Lilly and Anna have different fathers; neither father is involved in this appeal.

[2]    *See* 25 U.S.C. § 1903(4) (2018) (" 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.").

treatment program, but she was discharged early due to noncompliance. An outpatient psychosocial assessment resulted in a diagnosis of a severe alcohol use disorder in early remission.

That summer Louisa left Lilly, age six, and Anna, less than a year old, alone while she went out drinking. OCS took emergency custody of the children, and Louisa was arrested for child endangerment. OCS again worked with the family, and Louisa engaged in her case plan, successfully completing an outpatient treatment program in January 2015.

In December 2015 the children were placed with Louisa and her new husband, Aaron, for a six-month trial home visit. Louisa appeared to be sober and doing well, and OCS closed its case in June 2016.

**B.     OCS's Removal Of The Children In 2017**

In February 2017 OCS took custody of the children again because of concerns about domestic violence in the home and Louisa's continued substance abuse. After a contested hearing, the superior court found probable cause that the girls were children in need of aid.

OCS arranged urinalyses (UAs) and supervised visits with the children. According to an OCS caseworker, Louisa was "fairly open about her alcohol problem" and recognized that she needed help. OCS referred her for a substance abuse assessment, a program for victims of domestic violence, and individual counseling. OCS also involved Aaron, the girls' new stepfather, in case planning. In August Louisa stipulated that the children were in need of aid.

OCS referred Louisa to Turning Point substance abuse treatment program, where she attended weekly sessions. Turning Point initially recommended level one outpatient treatment, but by August Louisa had missed several appointments and had been picked up by the police twice for public intoxication; her counselor changed the

recommendation to level two outpatient treatment, and OCS referred Louisa elsewhere for it. She successfully graduated from a six-month outpatient program in December 2017, but she soon relapsed.

Toward the end of 2017 Lilly claimed that Aaron had sexually abused her. Louisa did not believe Lilly, and OCS tried to connect Louisa with services to help her process the information. Because Louisa wanted to discuss the allegations with Lilly, OCS cancelled visits until it could establish guidelines for what Louisa "could and could not talk about." But once visitation resumed, Louisa "cornered" Lilly in the bathroom and talked to her about the abuse. Louisa eventually accepted the truth of Lilly's claim; Louisa left Aaron in March 2018 and moved into a shelter.

### C.     OCS's Refusal To Place The Children With Louisa At Stepping Stones

In March 2018 Louisa was accepted into Stepping Stones, a residential treatment program that accepted mothers with their children. But OCS denied Louisa's request that the children be allowed to attend with her, disqualifying her from the program. The OCS caseworker testified that at the time the request came in, OCS was at the point of changing the goal from family reunification to termination and adoption. The caseworker further explained OCS's reluctance to allow the children to live with Louisa:

> [Louisa] was still relapsing, not taking UAs, not engaging in all services. We had a sexual abuse disclosure that she wasn't truly believing. She was thinking about leaving her partner, but hadn't left her partner. So there was a lot of disruption in her life at that time. She was thinking when she did leave her partner, she'd be homeless. She didn't have a place to go. So it wasn't an appropriate time to think about reunification.

The caseworker testified that OCS also considered Louisa's many failed treatment attempts, the long period of time the girls had been in OCS custody, and Louisa's lack of progress on her case plan.

Louisa continued to struggle with her addiction after being disqualified from Stepping Stones. She "bounced between Fairbanks, Anchorage, and Nome" in April and May and had multiple detox stays and hospital visits. OCS continued to try providing services, but the caseworker testified that "trying to follow her to give her services was difficult."

In July Louisa had another substance abuse assessment, leading to a recommendation for intensive residential treatment. OCS arranged for Louisa to enter Akeela House, a sister program to Stepping Stones. OCS bought Louisa a plane ticket to Anchorage, but she missed the flight because she was intoxicated, missing her scheduled entry into the program. OCS bought Louisa another plane ticket and worked with Akeela House to have her admitted, but she left prematurely after about ten days. When the caseworker next spoke with Louisa she was at a women's shelter in the "Anchorage/Palmer area." The caseworker "highly suggested" that they try to get her back into Akeela House and suggested they call the program together, but Louisa wanted to try other treatment programs.

In late August the caseworker "attempted to set up visits again, but [Louisa] was off [the] radar." The caseworker testified that Louisa was "bouncing between" shelters in Anchorage and Palmer and "had problems keeping a phone because of her homelessness." The caseworker testified that Louisa "was really struggling." OCS filed a petition to terminate her parental rights and the rights of the two girls' fathers under AS 47.10.011(1) (abandonment), (2) (incarceration), (3) (custodian unable to provide

care), (6) (physical harm), (7) (sexual abuse), (8) (mental injury), (9) (neglect), (10) (habitual use of intoxicants), and (11) (mental illness).[3]

Visits between Louisa and the girls continued from June to October, but OCS eventually suspended them because their inconsistency was "affecting the kids" and "disrupted placements." When visits did happen, they seemed to prompt behavioral problems in the girls.

### D. Louisa's Treatment At Valley Oaks

In January 2019 Louisa entered Valley Oaks Treatment Center, where she remained through the termination trial in June. By the end of trial Louisa was almost five-months sober and on track to graduate from the program in less than a month. She testified that her treatment was going well; she said she was able to address her underlying trauma and that there was a "tremendous difference" in the program from others she had tried. After she completed the program she planned to spend the next 18 months in a sober living center with wrap-around services, where the children could live with her.

The OCS caseworker agreed that Louisa was doing well at Valley Oaks, but she worried that Louisa would be vulnerable to relapse after leaving the program and its highly structured environment.

### E. The Daughters' Special Needs

At the time of the termination trial Lilly was 11 years old and Anna was 5. The girls had been in OCS custody for over three and a half years. They had had at least ten different placements, eight of which followed the 2017 removal; the caseworker testified that the frequent moves were due to the girls' extreme behaviors. The children's

---

[3]  The petition appears to allege that Louisa's conduct implicated all of these subsections except (2), incarceration, which applied to one of the fathers.

therapist testified that moving around so much was hard on the girls because they often did not understand why they were moved and blamed themselves.

The girls had special needs beyond those of ordinary children. Both had experienced sexual abuse and had been diagnosed with PTSD. The children's therapist testified that Anna had attachment issues and exhibited severe trauma symptoms, including acting "violently towards others, particularly towards mother figures in her life, but also towards children and animals." Anna was "very affected by traumatic reminders" and self-harmed. Lilly had fetal alcohol spectrum disorder and demonstrated concerning sexual behaviors. An expert in clinical psychology testified that he had diagnosed Lilly with ADD and an "adjustment order with mixed anxiety and depressed mood" when she was seven years old. He testified that she would likely benefit from therapy and having consistency and structure in her life. He testified that when "structure and predictability" disappear, "[i]t creates a lot of anxiety and then regression." The children's therapist testified that she was very worried about the girls, particularly Anna, and that she thought it would be "devastating" if they were returned to Louisa's care. She testified that the girls needed permanency more than anything else.

F.     **The Termination Trial And Termination Order**

The termination trial took place over seven days from late April to mid-June 2019. Participants included OCS, Louisa, the guardian ad litem, Anna's father, and a representative of the children's tribe.[4] OCS called six expert witnesses, including the children's therapist; an expert on the culture of the Nome region; three experts on substance abuse and addiction; and an expert in clinical psychology. In September the superior court issued an order terminating Louisa's parental rights, finding that the

---

[4]     Anna's father voluntarily relinquished his parental rights to Anna conditioned on the termination of Louisa's parental rights. Lilly's father did not participate, and his parental rights were terminated based on OCS's offer of proof.

children were in need of aid under AS 47.10.011(7) (sexual abuse), (8) (mental injury to the child), (9) (neglect), and (10) (parental substance abuse).

Louisa appeals. She challenges the superior court's finding that her custody of the children would likely result in serious emotional or physical damage to them and that OCS made active efforts to prevent the breakup of the family.

## III. STANDARDS OF REVIEW

"We review de novo the court's conclusions of law, such as whether the superior court's findings and the expert testimony presented at trial satisfy the requirements of ICWA."[5] "A trial court's determination that a parent's continued custody of a child will likely result in the child suffering serious emotional or physical damage is a factual finding that we review for clear error."[6] "Whether OCS made active efforts to provide remedial and rehabilitative services to reunify the family as required by ICWA is a mixed question of law and fact. We review the content of the superior court's findings for clear error, but we review de novo whether those findings satisfy the requirements of the CINA rules and ICWA."[7]

## IV. DISCUSSION

### A. It Was Not Clear Error To Find That The Children Would Likely Suffer Serious Harm In Louisa's Custody.

Before parental rights can be terminated in an ICWA case, OCS must prove

---

[5] *Eva H. v. Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1052 (Alaska 2019) (quoting *Bob S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 400 P.3d 99, 105 (Alaska 2017)).

[6] *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 962 (Alaska 2013).

[7] *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 526 (Alaska 2013) (citations omitted).

"by evidence beyond a reasonable doubt, including the testimony of qualified expert witnesses, that continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[8] This requires evidence that "(1) the parent's conduct is likely to harm the child and (2) the parent's conduct is unlikely to change."[9] Louisa does not dispute that her substance abuse, if it continued, would likely harm the children. But she argues that there was insufficient evidence, including the testimony of experts, to support a finding beyond a reasonable doubt that her conduct was unlikely to change.

### 1. The ICWA requirement of qualified expert testimony was satisfied.

We addressed "whether expert testimony on its own must directly answer both prongs of the [serious harm] test" in *Diana P. v. State, Department of Health & Social Services, Office of Children's Services*.[10] We concluded that "so long as qualified expert testimony directly supports one prong of the substantial harm requirement and inferentially supports the other prong, the statutory requirements will be satisfied."[11] Here, although no expert witness testified directly that Louisa was likely to relapse, expert testimony "inferentially supports" that finding.

---

[8] CINA Rule 18(c)(4); *see also* 25 U.S.C. § 1912(e) (2018).

[9] *Diana P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 355 P.3d 541, 546 (Alaska 2015).

[10] *Id.* at 547.

[11] *Id.*; *see also Eva H. v. Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1057 (Alaska 2019) ("We have held in the past that expert testimony need not directly address every aspect of this element of a termination decision; trial courts are allowed to consider 'reasonable inferences from the expert testimony, coupled with lay witness testimony and documentary evidence from the record.'" (quoting *Diana P.*, 355 P.3d at 548)).

Two expert witnesses in substance abuse and addiction counseling testified that they had performed assessments of Louisa and concluded that she had a severe alcohol use disorder. Both experts testified that it is not unusual for someone to relapse after a period of sobriety. One testified that it usually takes "at least a year of continued substance abuse treatment and participation to know that [someone is] well on their way to recovery" because "[i]t takes that long for the brain and the body to recover from . . . the changes that alcohol and drugs induce in the brain." The other expert testified that a history of treatment and relapse — like Louisa's — lessens the chance of success. There was also testimony that Louisa would need to work hard and remain engaged with support services — perhaps for her lifetime — to successfully deal with the "constant risk of relapse." And the superior court could reasonably infer that Louisa's struggle would be made even more difficult if she were, at the same time, caring for two girls with significant needs of their own.

Louisa notes that none of the expert witnesses had evaluated her in some time, and she argues that her progress in treatment was a significant enough change in circumstances to cast doubt on their testimony. But expert testimony "does not need to be the sole basis for [the serious harm] finding; it simply must support it."[12] Because qualified expert testimony directly supported the first prong of the serious harm requirement and inferentially supported the second, the ICWA requirement that the finding be supported by the testimony of qualified expert witnesses was satisfied.

### 2. The court did not clearly err in finding beyond a reasonable doubt that Louisa's conduct was unlikely to change.

Louisa also challenges the weight of the evidence, arguing that, given her

---

[12] *Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 558-59 (Alaska 2017) (quoting *Marcia V. v. State*, 201 P.3d 496, 508 (Alaska 2009)).

recent progress, the superior court could not have found beyond a reasonable doubt that her conduct was unlikely to change.[13] But we conclude that this finding was not clearly erroneous.

"Although the court must focus on risk of future harm rather than past injury, past failures may predict future conduct."[14] Louisa had attempted treatment at least six times. At least three of those attempts were fairly extended stints in treatment: Louisa had inpatient treatment for roughly five months in early 2014, and she completed outpatient treatment programs in 2015 and 2017. At one point she was sober for a nine-month period. But she always relapsed. In June 2016 OCS closed its case with the family after Louisa successfully completed inpatient treatment and there was a successful six-month home visit. But Louisa was still unable to remain sober, and OCS had to take custody of the children again within a year of closing its first case. The superior court recognized that Louisa seemed to want to quit drinking, but although she was "open and honest" about her alcohol problem she had nevertheless been unable to maintain sobriety. Expert testimony supported the conclusion that Louisa's past history of treatment and relapse dimmed her chances of success notwithstanding her ongoing treatment.

Louisa argues that her past conduct is not proof of her likelihood of remaining sober in the future because her five months of sobriety and treatment at Valley Oaks are a significant change in circumstances. In *J.J. v. State, Department of Health*

---

[13]     15 U.S.C. § 1912(f) (requiring for termination "a determination, *supported by evidence beyond a reasonable doubt*, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (emphasis added)).

[14]     *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 767 (Alaska 2009).

*& Social Services, Division of Family & Youth Services*,[15] we reversed the superior court's finding that the children of a mother with an alcohol abuse problem were likely to be seriously harmed if they remained in the mother's custody.[16] At the time of the termination trial the mother had completed an inpatient treatment program, been sober for nine or ten months, and entered a supportive, sober relationship.[17] The superior court's finding in that case was based on the testimony of an expert, but the expert's knowledge of the case was incomplete: she had not met with the mother or her counselors, did not know that the mother had completed inpatient treatment, and did not know that the mother had maintained sobriety after treatment.[18] We noted, "Past addictive behavior and associated parenting failures may be predictive of similar conduct in the future. But a substantial period of sobriety before trial casts doubt on the reliability of predictions based on the earlier conduct."[19]

Louisa asks us to view her case in the same way because of her treatment at Valley Oaks, an "intervening event that cast[s] a reasonable doubt on the assumption that she would likely relapse again simply because she had relapsed before." She testified that her Valley Oaks experience was unlike any of her other treatment attempts: she was addressing her underlying trauma and felt supported in the program. And after completing the program, Louisa planned to live in a sober living center with wrap-around services for 18 months and to take Vivitrol, a drug that helps prevent relapses. She

---

[15]    38 P.3d 7 (Alaska 2001).

[16]    *Id.* at 11.

[17]    *Id.* at 8-9.

[18]    *Id.* at 10.

[19]    *Id.* at 11.

argues that unlike her attempts at sobriety in the past, "she was completing an inpatient treatment program for the first time, was no longer in an abusive relationship, and had housing and extensive support in place for her transition period."

Although there was reason for optimism regarding Louisa's sobriety, we cannot say it was clear error to find, in light of her long history of relapsing after seemingly successful treatment, that five months of sobriety were not enough to ensure her success. The evidence supports the superior court's finding beyond a reasonable doubt that Louisa's conduct was unlikely to change.

## B. The Superior Court Did Not Err In Finding That OCS Made Active Efforts To Prevent The Breakup Of The Family.

In a termination case, ICWA requires that OCS prove by clear and convincing evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[20] Louisa faults only one aspect of OCS's "active efforts": its refusal to place her children with her at Stepping Stones in March 2018. She characterizes this decision as a premature abandonment of the reunification goal despite her "demonstrated willingness to engage in services" in the safe environment that Stepping Stones could have provided.

But OCS provided reasonable support for its decision not to place the children with Louisa at Stepping Stones. The caseworker testified that OCS considered the facts that Louisa "was still relapsing, not taking UAs, not engaging in all services"; that she had not yet severed her relationship with the man Lilly had accused of sexually abusing her; and that if "she did leave her partner, she'd be homeless" upon leaving

---

[20] *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 760-61 (Alaska 2009) (quoting 25 U.S.C. § 1912(d) (2006); CINA Rule 18(c)(2)(B)).

Stepping Stones. The children's therapist testified extensively about the significant trauma the girls experienced as they moved from placement to placement during a time of their lives when they badly needed stability.[21] And given that OCS is required to seek termination of parental rights at 15 months of custody,[22] there was a high risk that Louisa's parental rights would be terminated even if her treatment at Stepping Stones was successful. "Active efforts are to be tailored to the facts and circumstances of the case."[23] Given the circumstances, OCS could reasonably conclude that it was not in the girls' best interests to place them in a situation likely to further the instability in their lives.

Furthermore, when judging active efforts we look at OCS's "involvement in its entirety."[24] OCS provided many services to the family, beginning with the opening of the 2014 OCS case and continuing through trial. These included referrals for inpatient and outpatient substance abuse assessments and parenting classes; therapy for the children and Louisa; family contact plans; safety plans; case plans; buying Louisa plane and bus tickets; supervised visitation; domestic violence classes; and trying to locate and

---

[21] AS 47.05.065(5) ("[N]umerous studies establish that (A) children undergo a critical attachment process before the time they reach six years of age; (B) a child who has not attached with an adult caregiver during this critical stage will suffer significant emotional damage that frequently leads to chronic psychological problems and antisocial behavior when the child reaches adolescence and adulthood; and (C) it is important to provide for an expedited placement procedure to ensure that all children, especially those under the age of six years, who have been removed from their homes are placed in permanent homes expeditiously.").

[22] AS 47.10.088(d)(1).

[23] 25 C.F.R. § 23.2 (2016).

[24] *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 271 (Alaska 2011) (quoting *Dale H. v. State, Dep't of Health & Servs.*, 235 P.3d 203, 213 (Alaska 2010)).

work with the girls' fathers.  OCS continued to provide active efforts and work toward reunification even after it decided that adoption should be the permanency goal.  After denying placement of the girls at Stepping Stones, OCS arranged for Louisa's admission to Akeela House, tried to remain in regular contact with her, and tried to facilitate visitation with the girls, including buying plane tickets for in-person visits.  The superior court's findings about OCS's active efforts are not clearly erroneous, and they satisfy the statutory standard.

## V.    CONCLUSION

We AFFIRM the superior court's order terminating Louisa's parental rights.