J.A., Appellant,

v.

STATE of Alaska, DFYS, Appellee.

No. S–10143.

Supreme Court of Alaska.

July 5, 2002.

397

Avràham B. Zorea, Anchorage, for Appellant.

Christi A. Pavia, Assistant Attorney General, Bethel, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and
CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

J.A. appeals the termination of his parental rights to his three Native children. We must determine whether expert testimony was sufficient under the Indian Child Welfare Act to support the trial court's conclusion that the children would likely suffer serious harm if they were returned to J.A.'s custody. We hold that the experts' testimony was sufficiently related to the facts and issues of the case even though the experts based their opinions on hypothetical scenarios and a limited review of the family's case file. And because J.A. explicitly concedes that the state provided active efforts to prevent the breakup of his family, we also reject J.A.'s claim that the state's rehabilitative services should have been better tailored to his Native values.

## II. FACTS AND PROCEEDINGS

J.A. appeals the February 27, 2001 termination of his parental rights to his three children, C.A., T.A., and C. All three are Indian children within the meaning of the Indian Child Welfare Act (ICW).[1] A.A., J.A.'s estranged wife and mother of the three children, stipulated to the termination of her rights at trial.

The Alaska Department of Health and Social Services, Division of Family and Youth Services (DFYS), obtained temporary legal custody of C.A., the eldest child, in January 1998, based on reports of sexual abuse and neglect. The parents stipulated in July 1999 that C.A. was a child in need of aid under AS 47.10.011(7), (9), and (10), and acknowledged that their substance abuse placed C.A. at risk of substantial physical harm.[2] Following a contested disposition hearing in September 1999, the superior court awarded legal and physical custody of C.A. to DFYS.

DFYS obtained temporary legal custody of the two younger children in May 1999 after a social worker made an unannounced visit to Kongiganak in March 1999 and found both parents inebriated and unconscious; the youngest child, C., in the care of W.J., one of C.A.'s alleged abusers; and T.A., then five years old, playing outside unsupervised. Following C.A.'s removal from her parents' custody in September 1999, J.A. and A.A. stipulated that their two younger children, T.A. and C., were also children in need of aid under AS 47.10.011(7) and (9). They acknowledged that their substance abuse placed both children at risk of substantial physical harm and neglect. The court placed the children in DFYS's custody for two years in November 1999.

In February 2000 DFYS removed T.A. and C. from their parents' home due to continued substance abuse and domestic violence in the children's presence, as well as the parents' decision to continue to leave the children with A.A.'s mother and W.J. despite DFYS's warnings not to do so. The court made findings supporting the removal.

DFYS filed a petition to terminate both parents' rights to their three children in August 2000, and a termination trial was conducted in Bethel in January and February 2001. The Native Village of Kongiganak intervened and participated at trial. The village did not take a position at trial on the issue whether J.A.'s rights should be terminated. Rather, the village seemed principally interested in ensuring that the children be permanently placed in Kongiganak.

The superior court orally granted DFYS's petition with respect to A.A. following her decision not to contest termination at trial, and issued a written order granting DFYS's petition with respect to J.A. Following Alas-

1. 25 U.S.C. §§ 1901–23, 1951 (1988).

2. Under AS 47.10.011,
    the court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to
    ...
    (7) ... sexual abuse, ...
    (9) ... neglect[, or] ...
    (10) the parent['s] ability to parent had been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child. ...

ka Child in Need of Aid Rule 18(c), the court concluded that DFYS proved that C.A., T.A., and C. were children in need of aid under six subsections of AS 47.10.011. The court further found that J.A. had not remedied the conduct that caused his children to be in need of aid despite the department's active efforts to provide rehabilitative services. The court specifically noted J.A.'s recent relapses and failure to complete aftercare following his most recent substance abuse treatment program. Finally, the court concluded that there was "no doubt [J.A.'s] continued custody of these children is likely to result in serious emotional and physical damage to them."

J.A. appeals. The village does not join in J.A.'s appeal and has not filed a separate appeal.[3]

## III. DISCUSSION

### A. Standard of Review

■ J.A. limits his appeal to ICWA issues.[4] Whether substantial evidence supports the court's conclusion that J.A.'s children would likely be seriously harmed if they were returned to him is a mixed question of fact and law.[5] Whether expert testimony sufficiently supports this conclusion is a legal question.[6] We review the court's factual findings under the clearly erroneous standard[7] and its legal conclusions de novo.[8]

### B. The Superior Court Did Not Err by Relying on the Experts' Testimony.

J.A. argues that the experts' testimony was improperly based on hearsay. J.A. fur-

ther contends that the experts' testimony was insufficiently related to the facts and issues of the case to support the court's conclusion under ICWA that the children would likely suffer serious emotional or physical damage if they were placed with him. Finally, J.A. argues that the court over-relied on the experts' testimony in reaching its ultimate conclusion.

### 1. J.A.'s objection to Dr. MacIan's reliance on hearsay reports of sexual abuse is meritless.

■ J.A. argues that DFYS's expert psychologist, Dr. Paula MacIan, improperly relied on hearsay allegations of sexual abuse in forming her opinions. This objection fails because experts in termination cases may reasonably rely on DFYS records in forming their opinions, regardless of whether those records are hearsay.

Dr. MacIan based her opinion in part on DFYS records, including documents containing allegations of sexual abuse against C.A. and C. committed by Kongiganak community members and J.A., respectively. Dr. MacIan explained several criteria she used to determine whether the allegations were "substantiated," and testified that she only relied on the substantiated allegations to form her opinion. The trial judge ruled that although these "substantiated" allegations are hearsay, Dr. MacIan could rely on them because the court was satisfied with her testimony that experts in her field would reasonably do so.

This ruling was neither legal error nor an abuse of discretion.[9] Alaska Evidence Rule

---

**3.** The permanent placement issue is not presently before us. For this reason, and because the village did not participate in this case on appeal, we do not consider the village's position regarding permanent placement in this opinion.

**4.** Accordingly, J.A. does not challenge the superior court's conclusions that the state has proven by clear and convincing evidence that his children continue to be in need of aid and that he has not remedied the conduct that would place the children at substantial risk of harm if returned to him.

**5.** See L.G. v. State, Dep't of Health & Soc. Servs., 14 P.3d 946, 949–50 (Alaska 2000) (holding factual findings in termination proceedings are re-

viewed under clearly erroneous standard, but whether those findings comport with ICWA requirements is question of law).

**6.** See C.J. v. State, Dep't of Health & Soc. Servs., 18 P.3d 1214, 1217–18 (Alaska 2001) (reviewing sufficiency of expert testimony de novo).

**7.** L.G., 14 P.3d at 949–50 (citation omitted).

**8.** Id. (citation omitted).

**9.** See Liimatta v. Vest, 45 P.3d 310, 313 (Alaska 2002) (citation omitted) (reviewing trial court's decision to admit or exclude evidence for abuse of discretion).

703 explicitly allows experts to rely on otherwise inadmissible evidence so long as the material is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." We held in *Broderick v. King's Way Assembly of God Church* that " '[h]earsay can be a permissible basis for opinion testimony' provided the reasonable reliance test is satisfied," [10] and further held that experts can reasonably rely on information from other case workers to form their opinions.[11] J.A. asserts that the allegations of harm relied on by Dr. MacIan were unreliable, confusing, or unsubstantiated, but J.A. does not endeavor to explain these conclusory assertions, or explain why he thinks Dr. MacIan's methods for determining reliability are faulty or unreasonable. Accordingly, we are satisfied that the trial court did not abuse its discretion in ruling that Dr. MacIan could rely on the "substantiated" allegations of harm.

> **2. The experts' opinions were sufficiently related to the facts and issues of the case to support the trial court's conclusion that the children would likely suffer serious harm if returned to J.A.**

■ J.A. argues that the state's experts, Dr. MacIan and Professor Michael Daku, were not sufficiently familiar with the facts of this case to offer precise, reliable testimony supporting the court's conclusion, required under ICWA, that the children would likely suffer serious harm if returned to their father's custody.[12] We disagree.

J.A. relies on *C.J. v. State, Department of Health & Social Services*, in which we held that the expert's testimony was insufficiently based on "the facts and issues of the case" to support the trial court's conclusion that the child would suffer serious harm if returned to the father.[13] We first noted that the expert's conclusions were "considerably weakened by the fact that she received all information about this case from reading the file given to her by DFYS and never met or spoke with either C.J. or the children prior to the hearing." [14] We then observed that "her conclusions appear to be little more than generalizations about the harms resulting from a parent's absence and provide little discussion of the particular facts of the case." [15] In the companion case, *J.J. v. State, Department of Health & Social Services*, we again rejected the expert's testimony, noting that she based her opinion on outdated information and was therefore unaware of the parent's recent successful efforts to maintain sobriety for a significant length of time.[16]

J.A.'s attempts to analogize this case to *C.J.* and *J.J.* are unavailing. First, the fact that neither Dr. MacIan nor Professor Daku met with the parties is not determinative. We explicitly noted in *C.J.* that such pretrial interviews are not required in every case.[17] Here, both experts were sufficiently apprised of the facts by their review of selected DFYS records and by DFYS counsel's summaries of relevant facts and of the testimony of other witnesses. These summaries also served to keep the experts' testimony sufficiently grounded in the facts and issues of the case.

**10.** 808 P.2d 1211, 1217 (Alaska 1991) (quoting *Norris v. Gatts*, 738 P.2d 344, 349 (Alaska 1987)).

**11.** *Id.* (noting that had witness's testimony been offered as expert testimony, court could have admitted hearsay statements of other social workers and counselors that formed basis for expert opinion under Alaska Evidence Rule 705(c)) (citing *In re J.R.B.*, 715 P.2d 1170, 1174 (Alaska 1986)).

**12.** 25 U.S.C. § 1912(f) requires a court to determine "that the continued custody of the child by the parent ... is likely to result in serious emotional or physical damage to the child" before terminating parental rights to the child. This determination must be *"supported* by evidence beyond a reasonable doubt, including *testimony of qualified expert witnesses." Id.* (emphases added).

**13.** 18 P.3d 1214, 1218 (Alaska 2001); *see also J.J. v. State, Dep't of Health & Soc. Servs.*, 38 P.3d 7, 10 (Alaska 2001) (reaching same conclusion regarding same expert's testimony concerning mother).

**14.** 18 P.3d at 1218.

**15.** *Id.*

**16.** 38 P.3d 7, 10 (Alaska 2001).

**17.** 18 P.3d at 1218.

Professor Daku was qualified as an expert in substance abuse evaluation and diagnosis and the cultural dynamics of Native Alaskan families. Dr. MacIan was qualified as an expert clinical psychologist with specific expertise in child sexual abuse and neglect.

■ DFYS's attorney posed several hypothetical questions to Professor Daku. These questions included information relating to general family history; the parents' long history of substance abuse right up to the time of trial (including failed treatment attempts); J.A.'s failure to complete his aftercare plan following his second stay at the Phillips Alcoholism Treatment Center (PATC) in Bethel; the parents' substance abuse and domestic violence in the presence of the children; and allegations of sexual abuse of C.A. and C., including the parents' choice to continue to leave the children in the care of alleged perpetrators as well as the parents' failure to obtain counseling for themselves or their children. The court denied J.A.'s attorney's motion for mistrial made in the midst of DFYS counsel's presentation of these hypothetical questions, ruling that they were sufficiently based on prior testimony and that they comported with the court's notes.[18] Dr. MacIan received the same information in the form of DFYS counsel's summary of prior testimony. In addition, Professor Daku reviewed discharge summaries from the PATC program for both parents. Dr. MacIan reviewed various DFYS records, including a "family chart" containing allegations of sexual abuse and reports from the social worker's visits with the family.[19]

■ Both experts gave specific testimony directly related to the most relevant issues before the court: the parents' chronic, unabated substance abuse and resulting neglect of their children, including their inability to protect their children against the risk of sexual abuse.

Professor Daku expressed concern that J.A. had relapsed following his second residential substance abuse treatment program in the summer of 2000 and had not completed his aftercare program. He was even more concerned that J.A. continued to smoke marijuana up to the time of trial.[20] Professor Daku testified that J.A.'s likelihood of future relapse into alcohol use was potentially higher due to his continued marijuana use.[21] In fact, Professor Daku did not consider J.A. in recovery or sober at the time of trial as a result of his ongoing substance abuse.

Like Professor Daku, Dr. MacIan was concerned that J.A. had not demonstrated an ability to remain sober for an extended period of time. Both experts testified that J.A. would need to maintain a significant period of sobriety, complete his aftercare program, and associate only with sober individuals before reunification could be attempted. But both experts thought it very unlikely that J.A. would achieve such a transformation given his history of substance abuse, and both agreed that the children should not have to wait for J.A. to continue to try to achieve long-term sobriety.

Finally, both experts were concerned that J.A. might get back together with A.A., thereby jeopardizing his long-term recovery chances. Professor Daku testified that the parents' history of drug use and domestic violence, as well as A.A.'s lack of commitment to achieving sobriety, creates risks of future relapses into drug abuse and violence. He further opined that when one member of a couple commits to recovery and the other does not, the committed member has a more

---

18. J.A. does not explicitly challenge this ruling on appeal. Nonetheless, we hold that DFYS counsel's hypothetical questions were sufficiently based on the facts of the case to enable a qualified expert to give the testimony required by ICWA. *See* 25 U.S.C. § 1912(f); *see also* Parts II and III.B.3 for record corroboration of the facts assumed by these hypothetical questions.

19. The family chart contained the five "substantiated" reports of sexual abuse involving C.A. described in Part III.B.1.

20. At the termination trial, J.A. admitted to "getting stoned" with friends on a near-weekly basis.

21. He explained that marijuana and alcohol are "cross-addictive" and "cross-tolerant," meaning that someone recovering from an alcohol addiction would be more likely to resume abusing alcohol if he continued to smoke marijuana—the marijuana would lead the user back to his drug of choice, alcohol.

difficult time maintaining sobriety because of the other's continued drug or alcohol use.

Dr. MacIan testified that she was concerned that the parents had not obtained counseling for C. after C. alleged that J.A. sexually abused her when she was three-and-a-half years old. Dr. MacIan explained that children who do not receive counseling are more likely to be abused in the future and more likely to engage in sexually acting-out behavior because they do not learn appropriate boundaries for physical contact with others. She testified that children with histories of sexual abuse need heightened supervision. She was also concerned that the parents continued to place their children in W.J.'s care despite allegations that he was one of the perpetrators of sexual abuse against C.A.

Professor Daku testified that the children had already been harmed by their parents' destructive behavior, and would more likely than not suffer additional serious harm if returned to J.A.'s custody. Dr. MacIan testified that the children would likely be neglected if returned to J.A., and that they would suffer harm as a result. She testified that J.A. would be unavailable to the children during episodes of substance abuse, leaving the children at risk of exploitation by others.

Both experts recommended that J.A.'s rights to his three children be terminated. Professor Daku recommended adoption rather than reunification for the children because their parents continued to abuse substances and showed no signs of being able "to assume the responsibility of being parents anytime soon." Dr. MacIan recommended that J.A.'s rights to C. and T.A. be terminated because J.A.'s likely continued substance abuse placed the children at risk of further neglect. Dr. MacIan further recommended that J.A.'s rights to C.A. be terminated for the same reasons, including the parents' decision to continue to allow W.J. to associate with her.

In conclusion, Professor Daku and Dr. MacIan's testimony was "based on the particular facts and issues of the case to a [much] greater extent than occurred" in *C.J.* and *J.J.* Accordingly, their testimony was more than sufficient to support the trial court's conclu-sion under ICWA that J.A.'s children would likely be seriously harmed if returned to him.

3. **The trial court did not over-rely on expert testimony in concluding that the children would likely suffer serious harm if returned to J.A.'s custody.**

■ J.A. also argues that the court over-relied on expert testimony in reaching this conclusion. But the record is replete with evidence of J.A.'s chronic substance abuse and consistent neglect of his children's welfare independent of the experts' testimony.

The trial court explicitly noted that J.A. had an "abysmal track record, time after time neither following through with aftercare nor abstaining from mind/body altering substances." The court further found that J.A.'s "priorities are horribly skewed; substances obliterate any modicum of common sense and care for his children and expose them to neglect, domestic violence, and sexual abuse." Based on these findings, as well as the experts' testimony described above, the court concluded that "[J.A.'s] custody of the children would be disastrous." The trial court's findings regarding J.A.'s substance abuse and its adverse consequences on his children are fully supported by the record.

Both parents have long histories of substance abuse that continued relatively unabated right up to the time of trial. J.A. completed his second residential treatment program at the PATC in Bethel in September 2000, but failed to complete his prescribed aftercare program and relapsed within three weeks of his discharge. He claimed to have abstained from alcohol for six to eight weeks before the February 2001 termination trial, but admitted to continued near-weekly marijuana use.

■ Substantial evidence supports the court's concerns that J.A.'s substance abuse contributes to his violent tendencies. J.A. has been convicted of assaulting his wife four times, most recently in February 2000. A.A. testified that J.A. was drunk each time he assaulted her, and one of J.A.'s convictions includes an affidavit that J.A. exhibited many common symptoms of inebriation immediate-

ly after the incident. One or more of the children were present on at least two of these occasions.

The record also contains substantial evidence that the children are at risk of sexual abuse as long as they are in their parents' care. J.A. argues on appeal that past allegations of sexual abuse were not proved at trial. But AS 47.10.011(7) requires only that conduct by the child's parent place the child at *substantial risk* of sexual abuse.[22] J.A. does not argue that his children are not at risk. J.A. also does not challenge the court's 1999 findings that C.A. "ha[d] been sexually abused by several members of her home community," and that she was at risk of further abuse as a result of her parents' substance abuse and resulting neglect.[23] These uncontested findings are sufficient proof of risk, and there is no doubt that the parents were on notice of that risk. At the termination trial, both parents testified that they knew W.J. and other members of his village may have abused C.A., yet they both admitted that they continued to leave their children with W.J. despite DFYS's repeated warnings not to do so.

Accordingly, the trial court did not err when it found in its February 2001 termination order that although J.A. was aware that C.A. had "probably been sexually abused ... and was at continued substantial risk of abuse," he "could not articulate anything he had done to protect any of the children amidst his drinking, smoking, and Bethel travel."

Thus, substantial evidence in addition to the experts' testimony supported the trial court's conclusion that, beyond a reasonable doubt, J.A.'s substance abuse and resulting neglect would continue to place his children at risk of serious emotional and physical harm were they returned to his custody.

## C. DFYS Did Not Fail To Offer Rehabilitative Services that Were Sufficiently Respectful of J.A.'s Native Values.

J.A. argues that DFYS should have offered rehabilitative services that were better tailored to his cultural background, and that this court should generally require a closer fit between DFYS case plans and traditional Native values. J.A.'s only specific complaints in this regard are that he should have been allowed to use his parents as his sober support group and to complete the aftercare component of his substance abuse treatment program in Kongiganak rather than Bethel.

J.A. concedes that the superior court correctly determined that DFYS made sufficient active efforts to provide rehabilitative services to prevent the permanent breakup of J.A.'s family as required by ICWA.[24] Because there is no other legal basis under ICWA or elsewhere that would justify imposing heightened requirements on DFYS in this case, J.A.'s argument fails.

But even if we could reach the merits of this claim, J.A. would not prevail. J.A. presented no evidence that DFYS forbade him from using his parents as sober support contacts.[25] J.A. also presented no evidence that DFYS required J.A. to stay in Bethel for aftercare following completion of his second residential substance abuse program at the PATC. This is not to say the state would not have had good reason to impose such a requirement: all of J.A.'s assault convictions arose out of incidents in Kongiganak, and most of the documented instances of substance abuse and child neglect took place there as well. Therefore, the state could

---

**22.** Indeed, DFYS makes no claim on appeal that the children were actually abused. Rather, it argues that the parents ignored the risk of possible abuse in the past and are very likely to continue to do so.

**23.** The court's order terminating J.A.'s parental rights explicitly incorporated the court's findings from prior hearings regarding J.A. and his family.

**24.** 25 U.S.C. § 1912(d).

**25.** J.A. suggests that the state's expert condemned this arrangement. But Professor Daku simply opined that he thought family members should not be Alcoholics Anonymous (AA) sponsors because they could not be counted on to be sufficiently objective. Professor Daku made no negative remarks about J.A. using his parents as part of his sober support community, and clearly distinguished sober contacts from AA sponsors.

have required J.A. to relocate temporarily to Bethel as part of its case plan notwithstanding J.A.'s preference to live in his Native community.

## IV.  CONCLUSION

For these reasons, we AFFIRM the superior court's termination of J.A.'s parental rights to his three children.