NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ORIN W., | ) |
| | ) Supreme Court No. S-18394 |
| Appellant, | ) |
| | ) Superior Court Nos. 3PA-18-00074/ |
| v. | ) 00075/00076 CN |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) MEMORANDUM OPINION |
| OF FAMILY & COMMUNITY | ) AND JUDGMENT* |
| SERVICES, OFFICE OF | ) |
| CHILDREN'S SERVICES, and KRIS | ) No. 2002 – December 13, 2023 |
| W., | ) |
| | ) |
| Appellees, | ) |
| | ) |
| and | ) |
| | ) |
| THE CENTRAL COUNCIL OF | ) |
| TLINGIT & HAIDA INDIAN TRIBES | ) |
| OF ALASKA, | ) |
| Intervenor- | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Jonathan A. Woodman, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee State of Alaska. Megan R. Webb, Assistant Public Defender, and Samantha Cherot, Public

---

\*      Entered under Alaska Appellate Rule 214.

Defender, Anchorage, for Appellee Kris W. Rachel M. Espejo, Anchorage, for Intervenor-Appellee Tlingit & Haida Tribes.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I.    INTRODUCTION

Three children were found to be in need of aid due to their mother's chronic substance abuse.  The Office of Children's Services (OCS) removed the children from the home and placed them with foster parents.  OCS did not place the children with the father due to concerns about the father putting the children at risk.

After initially refusing to engage in case planning, the father made progress sufficient to attempt a trial home visit.  Shortly after the visit began, though, the father was arrested for driving while under the influence with the children in the car.  OCS again removed the children.  The father's communication and participation in his case plan thereafter became sporadic.

The superior court ultimately terminated the father's parental rights.  He now appeals the various findings underlying the termination order.  Because the record supports all of the superior court's findings and we see no legal error, we affirm the termination of his parental rights.

## II.    FACTS AND PROCEEDINGS

Orin W. and Kris W. were married in 2010 and have three children together:  Amalia, Orin Jr., and Selene.[1]  The couple separated in 2016 and were divorced in 2018.  Kris is a member of the Central Council of the Tlingit and Haida Tribes of Alaska (Tlingit and Haida Tribes), and the children are Indian children under

---

[1]    We use pseudonyms for all family members.

the Indian Child Welfare Act (ICWA).[2]  Kris relinquished her parental rights as of June 2022.

### A. Both Parents Have A History Of Substance Abuse And Domestic Violence, And This Contributed To OCS's Removal Of The Children From The Home.

Both parents have struggled with a history of substance abuse and domestic violence.  Orin reported that he has smoked marijuana daily since he was 16 and has tried a variety of other illegal drugs.  At one point he stated that he used marijuana "20 times daily for a total of 1 gram a day."[3]  Orin has been arrested for reckless driving (23 years ago), disorderly conduct with intent to fight (5 years ago), and DUI (10 years ago).  Following his DUI conviction, Orin attended substance abuse treatment, and was discharged with "potential for relapse."

Since 2013 Kris sought and obtained multiple short- and long-term domestic violence protective orders (DVPOs) against Orin.  Orin reported during a 2020 psychological evaluation that Kris had filed seven DVPO petitions against him.

In March 2018 OCS filed a non-emergency petition to remove the children from Kris due to reports that she was chronically intoxicated and neglecting the children.  The petition also alleged some prior incidents of neglect and physical abuse by Orin, who was living elsewhere at the time but still involved with the children's care.  The children were removed from the home.

In September 2018 the court found the children in need of aid pursuant to AS 47.10.011(10) (substance abuse causing risk of harm to children) based on the "stipulation of the parents."  The stipulation, however, came only from Kris, as Orin's

---

[2]    *See* 25 U.S.C. § 1903(4) (defining an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

[3]    Orin also reported that he obtained a medical marijuana card for pain after a car accident in 2008.

attorney had not been able to contact him before the hearing. Orin did not subsequently object to the court's findings.

**B.  From March To December 2018 Orin Resisted Case Planning And Drug Testing But Actively Visited The Children.**

Orin was initially resistant to working with OCS. Following the children's removal, the caseworker asked him to do a urinalysis and hair follicle drug test. Orin did neither, despite an appointment and reminder text. In March and April Orin would not engage with OCS and told the caseworker to talk to his lawyer. Given this, Orin's initial case plan was created without his input.

Visitation began in May, but by June Amalia's and Orin Jr.'s therapists recommended suspending visitation due to several incidents. These included an incident in which Orin entered the visitation providers' closed offices, sneaked a pocketknife into Orin Jr.'s backpack, and whispered into the children's ears. During another visit he purposefully made two of the children cry, and their foster mother reported that Orin twice threatened to burn her house down. OCS maintained visitation but moved the visits so they would be supervised at the OCS offices.

At some point in July or August, Amalia stopped attending visits with Orin. During this time, there was an incident in which Amalia agreed to go in and say "hello" to Orin at the urging of her foster mother. Orin then told Amalia that he was going to "come and get her." This scared Amalia enough that she could not sleep alone for three nights.

For the remainder of 2018 Orin's general approach was one of mistrust of OCS, and he would not engage in any services or talk with OCS, except regarding visitation. During this time period Orin met with a caseworker to review his case plan. The case plan required Orin to participate in drug testing, complete various assessments, follow the resulting recommendations, and attend parenting classes. Between July and October he did not show up for scheduled weekly drug testing appointments. Orin did attend one OCS-referred drug test in December and tested positive for marijuana.

**C.** **From January To November 2019 Orin Worked With OCS Toward A Trial Home Visit, But He Was Arrested For DUI Shortly After The Trial Home Visit Began.**

In January 2019 Orin began working on his case plan. This included completing an assessment, pursuing his treatment recommendations, and meeting with OCS caseworkers to review and update his case plan. Orin was diagnosed with cannabis dependence, and his evaluator recommended both outpatient substance abuse treatment and a mental health assessment and treatment to address possibly undiagnosed anxiety and/or ADHD.

At the end of January, a new OCS caseworker was assigned. Orin and this caseworker worked well together, and Orin continued to make positive steps in completing his case plan. Despite these positive steps, Orin continued to struggle in some respects. OCS scheduled mental health services for Orin, but he did not attend. In March Orin also left the substance abuse treatment that he had started in January, against staff advice, and with "unsatisfactory" progress. Similarly, Orin did not complete a recommended anger management course.

Orin and Amalia's relationship also continued to be challenging. She attended some visits, but not others, and was especially reluctant if her siblings were not present. In September, for example, Amalia became so agitated at Orin's insistence that she visit with him that she began "screaming and banging her head against [a] dresser." Orin disagreed with the level of autonomy OCS gave Amalia in deciding whether to attend visits.

Despite these challenges, from January to October Orin had regular visitation with the children, and progressed from supervised visitation to unsupervised visitation away from the office. Eventually OCS approved a trial home visit in October. One of the conditions of the trial home visit was that Orin not consume any alcohol, marijuana, or other substances.

A little over a week into the trial home visit, Orin was arrested for DUI with the children in the car. Prior to the arrest he and Amalia were arguing. At some point she got out of the car and flagged down a bystander. The police were called and Orin was arrested and charged with DUI and three counts of endangering the welfare of a minor.

Orin admitted that he had smoked marijuana earlier in the day, and that he had drunk alcohol with friends the night before. The arresting officer described Orin as intoxicated. Orin's initial breath test showed a breath-alcohol concentration (BAC) of 0.049, and a later test showed a BAC of 0.066.[4] A blood test was positive for marijuana. OCS was concerned about reports that Orin left the children unattended the night before the DUI arrest, scaring Orin Jr., as well as his lack of concern for the fact that his driving scared the children.

Orin consistently and adamantly asserted that he had had no alcohol in his system while driving and that his earlier marijuana use had no effect on him. The DUI and reckless endangerment charges were eventually dismissed when Orin pled guilty to reckless driving.

OCS terminated the trial home visit and resumed foster care for the children. The caseworker determined that Orin had made "no progress" on his case plan. After the failed trial home visit, Orin returned to supervised visitation but resisted re-engaging with case planning or services because he believed he had completed everything in his plan. He was also arrested two times for violating conditions of his release in the DUI case, and he was convicted of two counts related to drinking alcohol and using marijuana.

---

**4**    The per se legal limit for purposes of driving or operating a motor vehicle is a BAC of 0.08, meaning "there is 0.08 percent or more by weight of alcohol in the person's blood" or "0.08 grams or more of alcohol per 210 liters of the person's breath." AS 28.35.030(a)(2).

**D.** **From January 2020 To September 2021 Orin Largely Refused To Engage With OCS, Stopped Communicating For Six Months, And Then Reestablished Contact But Only To Arrange Visitation.**

Orin participated in an OCS-scheduled psychological evaluation in February 2020. The psychologist diagnosed Orin with marijuana dependence, alcohol abuse, anxiety disorder, and antisocial behavior traits. The psychologist recommended that Orin stop using marijuana and alcohol, provide proof of sobriety, engage in individual counseling and mental health services, and work with a therapist to repair his relationship with Amalia.

Throughout the rest of the year OCS attempted to get Orin to follow these recommendations. This included reviewing the case plan with him, discussing different actions he needed to take, scheduling drug tests, and setting up appointments for him. Despite these efforts, Orin did not engage with any of the recommendations from the evaluation, and he continued to refuse drug testing or any other services. Orin primarily blamed OCS, Kris, or Amalia for these failures.

By July 2020 OCS began having trouble contacting Orin. He also began missing visits with the children. OCS was unable to reach Orin from October 2020 until March 2021, despite multiple attempts to contact him.

Once OCS regained regular contact with Orin, a caseworker encouraged him to begin individual therapy and to demonstrate sobriety. However Orin told the caseworker he would not work on the case plan until visitation restarted.

Due to Orin's extended absence, OCS had cancelled visitation services. Further, as a consequence of COVID, there was a long waitlist to restart in-person supervised visitation. Nevertheless, as soon as contact with Orin had been reestablished, OCS put him on the waitlist to restart supervised visitation. During this time the younger children's clinician recommended holding off on visits due to a recent placement change. And Amalia's clinician continued to recommend no visitation. She also recommended that Orin make progress in individual therapy before reengaging in

family therapy with Amalia as a pathway back to visitation with Amalia. In July Zoom visits resumed with Orin Jr. and Selene, and Orin remained on the waitlist to restart in-person supervised visitation with them. But Orin still refused to work on his case plan, undergo drug testing, attend individual therapy, or even provide OCS with his address.

Then, as of September 2021, Orin moved to North Carolina. Despite his continued refusal to give OCS his address, OCS referred him to a provider in North Carolina for both treatment and drug testing. Orin again refused to engage in treatment, although he did complete a release of information for the North Carolina provider. By that point his case was midway through trial regarding termination of his parental rights.

### E. The Termination Trial Was Held In 2021, And The Case Was Remanded Twice Before The Final Order Was Entered In January 2023.

The termination trial was held over four days in May, September, and November 2021. The court heard testimony from Orin, the psychologist that conducted Orin's 2020 psychological evaluation, the last OCS caseworker assigned to Orin's case, one expert witness, and the younger children's foster mother. The expert witness specialized in child protection and child welfare cases. She testified that Orin's history of domestic violence would place the children at risk if returned to his care.

The court's initial order terminating Orin's parental rights was issued in April 2022. It found by clear and convincing evidence that the children were in need of aid under AS 47.10.011(8) (mental injury) and (10) (substance abuse causing substantial risk of harm to child). It also found that Orin had not remedied the conduct that placed the children at risk of harm, that OCS had made active efforts to reunite the family, that return of the children to Orin's custody would likely result in serious harm to the children, and that termination of Orin's parental rights served the children's best interests.

Shortly after his parental rights were terminated, Orin sent a barrage of profane, angry, and threatening emails to Orin Jr. and Selene's foster mother. He also

sent social media messages to his children that implied he was either going to take them away or kill them. He posted a "kill list" on social media, with the foster mother's name at the top of the list along with her business address. Several days later men showed up at the business and threw things at the building. These events resulted in the foster mother being granted a DVPO for herself and on behalf of the children, against Orin, in December 2022.

Meanwhile Orin had appealed the termination of his parental rights. In June 2022, the State moved for a limited remand. We granted the motion to allow the trial court to supplement its findings of fact and conclusions of law. The trial court issued its amended findings and conclusions later that month. It maintained the termination of Orin's parental rights.

In August the matter was again remanded for further expert testimony "regarding the social and cultural standards of the Indian child's Tribe" in light of this court's decision in *State, Department of Health & Social Services, Office of Children's Services v. Cissy A.*[5] In January 2023 the court heard additional testimony from an expert on the prevailing cultural and social standards of the Tlingit and Haida Tribes. The expert discussed important cultural norms and customs for the Tlingit and Haida Tribes, as well as factors that the Tribes would consider important in this matter. These included the children's "extensive exposure to violence, drugs and alcohol" and the "demonstrated fear [of Orin] exhibited by one or more of the children." The expert considered Orin's failure to address or change his violent and angry behavior to be significant, and noted the DVPO recently obtained by the foster mother against Orin. The expert testified that these factors made it impossible to develop an alternative plan to termination under tribal custom. The court again maintained the termination of Orin's parental rights.

---

[5] 513 P.3d 999 (Alaska 2022).

**F.  Orin Appeals The Termination Of His Parental Rights.**

Orin now appeals the superior court findings, arguing that the superior court clearly erred in finding the children to be in need of aid and in finding that he failed to remedy the conduct or conditions causing the children to be in need of aid. Orin further argues that the court erred in concluding that OCS made active efforts to reunite the family and in determining that OCS had proven beyond a reasonable doubt that the children would suffer serious harm if returned to him.  Finally he asserts that the expert witness testimony the court received was inadequate under the relevant legal standards.

## III.  STANDARD OF REVIEW

Whether a child is in need of aid is a factual determination reviewed for clear error.[6]  Whether a parent has remedied the conduct or conditions causing a child to be in need of aid is also a factual finding.[7]  The superior court's findings of fact are upheld unless a review of the record leaves this court "with a definite and firm conviction that a mistake has been made."[8]

"Whether the state complied with the 'active efforts' requirement of [ICWA] is a mixed question of law and fact."[9]  Whether sufficient evidence supports

---

[6]      *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 310 P.3d 943, 948-49 (Alaska 2013) (first citing *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 270 (Alaska 2011); then citing *Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1103-04 (Alaska 2011); and then citing *Hannah B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 289 P.3d 924, 930 (Alaska 2012)).

[7]      *Barbara P. v. State, Dep't of Health & Soc. Servs.*, 234 P.3d 1245, 1253 (Alaska 2010).

[8]      *See Sherman B.*, 310 P.3d at 949 (quoting *Pravat P.*, 249 P.3d at 269-70).

[9]      *Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 900-01 (Alaska 2021) (alteration in original) (quoting *Jude M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 394 P.3d 543, 550 (Alaska 2017)).

the court's conclusion that the children would be seriously harmed if returned to the parent is also a mixed question.[10]  For mixed questions of law and fact, we review the superior "court's factual findings for clear error and its legal determinations de novo."[11]

## IV.  DISCUSSION

### A.    The Court Did Not Clearly Err In Finding That The Children Were In Need Of Aid.

We affirm the superior court's finding that the children were in need of aid due to Orin's substance abuse.[12]  Before terminating a parent's rights, a "court must find by clear and convincing evidence that the child has been subjected to conditions or conduct that would qualify the child as a child in need of aid pursuant to AS 47.10.011."[13]  A court may find a child in need of aid under AS 47.10.011(10) if a parent's "ability to parent has been substantially impaired by the addictive or habitual

---

[10]    *J.A. v. State, Dep't of Fam. & Youth Servs.*, 50 P.3d 395, 399 (Alaska 2002) (citing *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 949-50 (Alaska 2000)).

[11]    *Clark J.*, 483 P.3d at 901 (quoting *Jude M.*, 394 P.3d at 550).  OCS asserts in its brief that this court sometimes reviews the "likelihood-of-harm finding solely as a factual finding reviewed for clear error."  We acknowledged in *Barbara P.* that "we have not been entirely consistent" in this area.  *See Barbara P.*, 234 P.3d at 1253.  Ultimately we review factual findings within the likelihood-of-harm determination for clear error, but legal questions (such as the sufficiency of expert witness testimony and whether the superior court's findings and determinations complied with ICWA) de novo.  *Compare Demetria H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1064, 1070-74 (Alaska 2018), *and Christopher C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 303 P.3d 465, 473, 479-80 (Alaska 2013), *with State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Cissy A.*, 513 P.3d 999, 1008 (Alaska 2022), *and J.A.*, 50 P.3d at 399.

[12]    Although the superior court determined that the children were in need of aid under AS 47.10.011(8) and (10), we need only affirm one of these bases in upholding the court's determination that the children were in need of aid.

[13]    *Barbara P.*, 234 P.3d at 1254 (citing AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A)).

use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child."[14]

Orin argues that the superior court erred when it found that "[t]he children were repeatedly exposed to harm or potential harm caused by substance abuse around them, particularly when [Orin] drove while intoxicated with the children in the car." He maintains that he had "no alcohol in his system" during his arrest for DUI, that his repeated failure to attend scheduled drug testing was due to "seriously suffer[ing] from a shy bladder (paruresis)," and that regardless, he completed the substance abuse treatment that was recommended for him. For these reasons Orin claims that there is "next to no evidence" that he abused substances or that this posed a risk to his children. We disagree.

Orin had a well-documented history of substance abuse even prior to the commencement of this case. At one time he reported that he has smoked marijuana daily since the age of 16 and that he has tried a variety of other illegal drugs. After being arrested for DUI in 2013, he underwent treatment, but was believed to have "potential for relapse" because he thought that "cannabis is not bad for you." Orin attended one drug test in December 2018 and tested positive for marijuana. Even after OCS became involved with his children, Orin acknowledged that he continued to heavily use marijuana on a daily basis.

Orin has also resisted substance abuse treatment and drug testing. After he admitted to marijuana use and drinking before driving during his initial interview with OCS, a caseworker requested that Orin do a urinalysis and hair follicle drug test, but he did neither. In March 2019, he also left substance abuse treatment that he had started in January, against staff advice, and with "unsatisfactory" progress. At another

---

**14** AS 47.10.011(10); *see also Barbara P.*, 234 P.3d at 1259 (holding that superior court did not err in determining that child was in need of aid based on parent's substance abuse).

point, in February 2020, Orin was diagnosed with marijuana dependence, alcohol abuse, anxiety disorder, and antisocial behavior traits as part of a psychological evaluation. The psychologist's report questioned whether Orin could or would stop smoking marijuana, and it stated that he minimizes the impact of marijuana and alcohol use on his ability to parent. The report also indicated that Orin does not think his behavior places his children at risk. Evidence points to the contrary.

Orin's difficulties with substance abuse and the risks it posed to his children were apparent during his trial home visit in October 2019. One of the conditions of the trial home visit was that he remain sober. OCS staff warned Orin that any indication of substance use would result in immediate removal of the children. Nevertheless, about a week into the trial home visit Orin was arrested for DUI with the children in the car. Orin admitted to smoking marijuana earlier that day and to drinking with friends the night before. The children reported that he was drinking little blue bottles with silver tops while driving, and the arresting officer described Orin as intoxicated. Rather than acknowledge the impact that his use of substances had on his children, including the fear and instability that his behavior caused them, Orin continued to blame others, including his daughter, for the failure of the trial home visit.

Overall, the record demonstrates that Orin engaged in a repeated pattern of substance abuse impacting his children and refused to meaningfully engage in treatment or recognize the seriousness of his behavior. The superior court did not clearly err in finding that Orin's substance abuse resulted in a "substantial risk of harm" to the children and rendered them in need of aid.[15]

B. **The Court Did Not Clearly Err In Finding That Orin Failed To Remedy The Conduct Causing His Children To Be In Need Of Aid.**

Before terminating a parent's rights, the superior court must find by clear and convincing evidence that "the parent has not remedied the conduct or conditions in

---

[15]     *See* AS 47.10.011(10).

the home that place the child at substantial risk of harm."[16] Orin asserts that the superior court's finding here was unsupported by the evidence. But the record of Orin's failures to engage in treatment and with important aspects of his case plan, as well as his continued substance abuse and inability to recognize the impact of that substance abuse on his children, provide ample support for the superior court's finding.

As discussed above, Orin has consistently failed to comply with his case plan's treatment recommendations regarding his marijuana dependence, alcohol abuse, anxiety disorder, and antisocial behavior traits. On multiple occasions he either left substance abuse treatment early or refused to engage in recommended treatment altogether. Moreover, multiple providers have recognized that Orin minimizes the impact of his substance use on his ability to parent his children safely, and as discussed above, those observations are well supported by Orin's actions and behavior toward his children. The record reflects that Orin has failed to gain insight regarding the connection between his substance abuse and the substantial risk that it poses to his children.[17]

We conclude that the superior court properly relied on Orin's refusal to engage in treatment or to change his behavior in finding that he failed to remedy the conduct that places his children at a substantial risk of harm.

---

[16] AS 47.10.088(a)(2)(A); AS 47.10.088(a)(2)(B) (court may instead find that parent "has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury").

[17] *See Emily S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-16518, 2017 WL 3318821, at *3 (Alaska Aug. 2, 2017) ("The question the superior court had to answer was not whether Emily had completed her case plan, but whether she had recognized and addressed the conditions and behaviors that endangered her child.").

**C.** **The Court Did Not Err In Ruling That OCS Made Active Efforts To Reunite Orin With His Children.**

ICWA requires that prior to termination of parental rights to an Indian child, OCS must demonstrate by clear and convincing evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."[18] Federal regulations define "active efforts" as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[19] When determining whether OCS's efforts were "active" we look to OCS's involvement "in its entirety."[20]

The superior court found by clear and convincing evidence that OCS made active but unsuccessful efforts to provide services to Orin. The court relied on OCS's overall efforts, including its longstanding attempts to regularly communicate with Orin and to help him understand the importance of his case plan. The court also looked to the numerous appointments OCS made and the assessments it scheduled for Orin to help him access the services that he needed to address his substance abuse. The court further emphasized that when Orin stopped communicating with OCS, OCS continued to try to contact him. And when Orin reengaged, OCS worked to connect him with meaningful services.

Orin asserts that OCS failed to provide active efforts to his family. In particular he argues that "OCS did not walk [him] through the steps of his plan, did not provide the required visitation instrumental to facilitating reunification, did not facilitate family therapy, and gave up on him completely after the failed home visit."

---

[18] 25 U.S.C. § 1912(d). CINA Rule 18(c)(2)(B) also restates this requirement.

[19] *Sam M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 731, 736 (Alaska 2019) (quoting 25 C.F.R. § 23.2 (2019)).

[20] *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1268 (Alaska 2008).

He also contends that he was improperly denied visitation with his children. We are not persuaded.

OCS consistently tried to provide services to Orin and to encourage him to engage with his case plan even when it encountered repeated resistance.[21] OCS's efforts included the following: talking with Orin about his case plan, setting up a psychological evaluation for him, meeting with him to discuss the recommendations of that evaluation, scheduling appointments for him, continuing to attempt to contact him when he disappeared, setting up fairly consistent in-person and telephonic visitation, obtaining a parenting advocate for him, coordinating drug testing, scheduling mental health services, offering parenting classes, and scheduling individual therapy both in Alaska and in North Carolina. Orin's criticisms of OCS are difficult to square with the efforts OCS undertook to encourage Orin to engage in case planning and to follow through with treatment, drug testing, and therapy. Indeed OCS's efforts assisted Orin in working toward a trial home visit with his children.[22]

Further, the assertion that OCS "gave up" on Orin after his DUI arrest during the trial home visit is likewise unsupported. After this incident OCS scheduled a psychological evaluation, and then repeatedly attempted to help Orin to follow up on its recommendations. OCS also continued to try to get in touch with Orin during his absence, and even sought out mental health and drug testing services in North Carolina when he moved there. Orin again refused to obtain treatment.

Orin also contends that difficulties with visitation rendered OCS's efforts inactive. But while there were lapses in visitation, the record reflects that many of those

---

[21] We recently clarified that the determination of whether OCS made active efforts in an ICWA case turns primarily on OCS's actions and not on a parent's willingness to engage. *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 562 (Alaska 2022).

[22] Orin acknowledges that OCS was making active efforts during the six or so months leading up to the trial home visit, when a particular caseworker was assigned.

lapses were due to Orin's conduct and unavailability as well as clinical recommendations against visitation.[23]

Visitation began in May 2018. By June there were already clinical recommendations to suspend visitation between Orin and both Amalia and Orin Jr. due to several incidents. Even still, visitation was not suspended at that time but was moved from a private provider to the OCS offices. Amalia did stop attending visits at some point in July or August, which Orin characterizes as OCS leaving visitation to Amalia's "whim." But this characterization ignores the clinical recommendation to suspend visitation, and the serious distress that Amalia experienced during and after visitation.

Despite clinical recommendations to suspend visitation, both OCS and the foster parents continued to try to facilitate visits, which eventually led to the trial home visit. And although Orin's visits with Amalia were suspended after his DUI arrest, the record reflects that OCS informed Orin why those visits were suspended and what he needed to do — engage in individual therapy — in order to resume the visits.[24] The record further supports that visitation was later restricted due to Orin's six-month disappearance, a long post-COVID waitlist to restart supervised visitation, and therapeutic recommendations to postpone visitation with the two younger children to allow them to settle into a new foster placement. Alleged flaws in OCS's

---

**23**    OCS is obligated to "provide reasonable visitation," but may deny visitation if "there is clear and convincing evidence that visits are not in the child's best interests." AS 47.10.080(p).

**24**    In the event that visitation is denied in the best interest of the child OCS must inform the parent about the reason for denial and the parent's "right to request a review hearing." *See* AS 47.10.080(p); CINA Rule 19.1(a).

visitation-related efforts do not undermine the superior court's determination that OCS made active efforts to reunite the family.[25]

Overall, the record demonstrates that throughout the life of this case, OCS made persistent and thoughtful efforts "to provide remedial services and rehabilitative programs" meant to reunite Orin with his family.[26] These efforts continued in spite of Orin's unwillingness to engage with his case plan.[27] To the extent there were difficulties with visitation, most breaks occurred because of Orin's failure to abide by therapeutic recommendations made in the best interest of his children and his six-month disappearance during the pandemic. Even then, OCS worked to restart visitation and continued to remain in contact with Orin and encourage him to engage in treatment. The superior court did not err in deeming OCS's efforts active.

**D.** **The Court Did Not Err In Determining That The Children Would Suffer Harm If Returned To Orin's Care.**

When seeking termination of a parent's rights over an Indian child, OCS must prove beyond a reasonable doubt "that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[28] "Proof that a parent having custody is likely to cause a child serious harm requires evidence that (1) the parent's conduct is likely to harm the child and (2) the parent's

---

[25] Orin also seems to argue that the court denied him a visitation hearing. But the record does not support such an assertion. There was one point during a permanency hearing, after the termination trial, during which Orin became agitated because OCS would not explain to him how he was violating visitation rules. The court suggested that Orin and OCS discuss privately and in more detail the specifics of how Orin was violating the "no promises" visitation rule, and why visitation was being suspended. At no point did Orin or his attorney request a visitation hearing.

[26] 25 U.S.C. § 1912(d).

[27] *See Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 556 (Alaska 2022) ("[T]he active efforts inquiry depends primarily on OCS's efforts, not the parent's reaction to those efforts.").

[28] 25 U.S.C. § 1912(f); CINA Rule 18(c)(4).

conduct is unlikely to change."[29]   In other words, a court must establish a "causal connection between the parent's conduct and serious damage to the child."[30]   The evidence must also include testimony from one or more qualified expert witnesses regarding whether continued custody with the parent is likely to result in serious harm, and it should address the relevant prevailing cultural and social standards of the Alaska Native child's tribe.[31]

Orin asserts that there was inadequate evidence for the court to determine that the children would suffer serious harm if returned to his care.  He argues that the expert witness testimony the court received was inadequate under the relevant legal standards.  He also claims that the cultural expert lacked personal knowledge of his family and of the children's tribe.  We address each point in turn.

First, the record supports the court's conclusion that Orin's children are likely to suffer serious harm if returned to his care.  The court heard and relied upon extensive evidence regarding Orin's substance abuse and the impact of that substance abuse on the children, as well as Orin's troubling behavior toward the children.  The court emphasized the fact that Orin drank alcohol, consumed marijuana, and endangered the children during the trial home visit, and that he had made no progress

---

[29]   *Diana P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 355 P.3d 541, 546 (Alaska 2015).

[30]   *State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Cissy A.*, 513 P.3d 999, 1010, 1015 (Alaska 2022).

[31]   *See id.* at 1009 ("A qualified expert witness *must* be qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and *should* be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe." (emphasis in original) (quoting 25 C.F.R. § 23.122(a))).  We also held that any exception to the requirement of cultural testimony is "very limited."  *Id.* at 1010 (quoting *In re April S.*, 467 P.3d 1091, 1099 (Alaska 2020)).

on important aspects of his case plan. The court also pointed to conclusions by both expert witnesses to support its likelihood of harm finding.

The first expert witness was qualified as an expert in child protection and welfare. She testified regarding a pattern of domestic violence, "coercive controlling behavior[]," and threatening behavior on Orin's part. She also testified regarding Orin's "lack of behavioral change," an inability to acknowledge or understand how his substance use and parenting decisions led to OCS involvement, and his tendency to blame others. For these reasons and others, she ultimately concluded that returning the children to Orin would likely cause serious emotional or physical harm, and that he already had caused harm to the children, particularly Amalia.

The second expert witness was qualified as an expert in the prevailing social and cultural standards of the Tlingit and Haida Tribes of Alaska.[32] She testified that under normal tribal custom, drug and alcohol use was not necessarily a reason for termination of parental rights;[33] a guardianship without separation of parental rights was usually preferred. The expert also testified that under the preferred guardianship arrangement in Tlingit culture, the parent "always remains the parent" but the guardian usually steps in to make parenting decisions. But she determined that this custom, if applied in this case, would be disrupted by Orin's threatening behavior.[34] In the opinion of the cultural expert, the final and decisive incident weighing against a guardianship was the report of Orin threatening the younger children's foster mother, necessitating a

---

[32] This qualification was made on the basis of the expert witness's membership in the Tlingit and Haida Tribes, background as a "magistrate, chief justice, presiding judge and pro tem judge for the Tlingit and Haida Court," and other relevant experience and knowledge.

[33] *See Cissy A.*, 513 P.3d at 1009-10 (recognizing that "children can thrive" even when parent abuses substances in the context of an ICWA termination case).

[34] The expert was also concerned about Orin's dangerous behavior while caring for the children, his history of domestic violence, and his tendency to shift blame away from himself.

DVPO. Ultimately, she noted that termination was supported by the tribe and concluded that under tribal custom, termination was appropriate.

Although Orin claims that the cultural expert lacked personal knowledge of his family and of the children's tribe, the expert's testimony more than met the requisite legal standards. Indeed, the testimony provided important and relevant cultural context and ensured that the court was not making decisions based upon a lack of cultural perspective.[35] In addition, all of the factual events referenced by both expert witnesses are supported in the record. This includes Orin's history of substance abuse, domestic violence, and threatening behavior, as well as his DUI arrest, tendency to blame others, and refusal to meaningfully engage in services related to mental health and substance abuse.

We see no error in the superior court's conclusion that Orin's children were likely to suffer serious harm if returned to his care.

## V. CONCLUSION

We AFFIRM the superior court's order terminating Orin's parental rights.

---

[35] *See Cissy A.*, 513 P.3d at 1013 (explaining that cultural expert testimony is normally required to ensure that termination decisions are based on the tribe's prevailing cultural, parenting, and social practices and standards, instead of on "unfounded assumptions or inapplicable cultural norms").